PRYOR, Circuit Judge:
The main issue presented in this petition is whether evidence, viewed in the light most favorable to the fact findings of the Immigration Judge, that two unknown persons for unknown reasons fired shots at the car of Luz Marina Silva, a Colombian citizen, soon after she had received a single written threat about her political activity and several threatening, but not political, telephone calls, compelled the conclusion that Silva suffered past persecution or has a well-founded fear of future persecution on account of her political opinion. Silva applied for asylum and alleged that she was persecuted in Colombia by the Revolutionary Armed Forces (FARC). Because Silva’s testimony at her asylum hearing failed to establish that the threats she received were more than mere harassment and she failed to establish that the shooting incident was based on her political opinion, the record does not compel the conclusion that she suffered past persecution or has a well-founded fear of future persecution. We deny Silva’s petition.
I. BACKGROUND
Silva was admitted to the United States as a nonimmigrant visitor on March 8, 2000, and was authorized to remain in the United States until March 12, 2001. One year later, just before she was scheduled to depart, Silva sought asylum. In her application for asylum and withholding of removal, filed on March 5, 2001, Silva contended that, because of her political activity, she was persecuted in Colombia by the FARC, a Marxist paramilitary group. Silva stated in her application that, while working on a political campaign in September 1999, she received a written death threat that was signed by the FARC. The application stated that, after Silva received the written death threat, the FARC started calling her daily at her house and restaurant, and, on October 9, 1999, two men shot at her car while she was driving and hit the rear window. Silva’s application stated that after the shooting she decided to leave the country, which she did on March 8, 2000. The application also stated that the FARC continued calling Silva daily until she left the country and that on the last call she was told that she was missed on October 9 but would not be missed again. Relevant portions of Silva’s asylum application are attached as Appendix A to the dissenting opinion.
The Immigration and Naturalization Service issued Silva a notice to appear on May 30, 2001, and charged Silva with re-movability for remaining in the United States for a longer time than permitted. See 8 U.S.C. § 1227. Silva appeared pro se before Immigration Judge Pedro Miranda in August 2001 and was granted a continuance to obtain an attorney. On February 26, 2002, Silva again appeared pro se before Judge Miranda and admitted the facts alleged in the notice to appear. At Silva’s request, Judge Miranda scheduled Silva’s removal hearing for September 16, 2002, to allow Silva time to prepare her case and locate an attorney. The removal hearing was finally held on December 13, 2002. Silva appeared pro se and stated that she had been unable to secure an attorney. Silva declined another continuance and stated that she was prepared to represent herself. Silva was the only witness at the hearing.
*1234 Silva testified that she had lived her entire life in Balta, Colombia, and she and her family had always been politically active. Silva testified that, although her family is known for its association with the Conservative party, she had participated in the mayoral and presidential campaigns of Antanas Mockus, a member of the Visionary party, since 1994. Silva worked for Mockus on a successful campaign for may- or of Bogota in 1994 and an unsuccessful bid for the presidency in Colombia in 1997. Silva explained that the Visionary party drew its members from both the traditional Conservative and Liberal parties.
During Moekus’s campaigns, Silva participated in “health brigades,” or “help brigades,” which were groups of people that traveled into neighborhoods and offered the residents of those neighborhoods health services to encourage support of the Visionary Party. Silva stated that she spoke on behalf of Mockus to people around her but never in front of an audience. Silva offered no evidence that she was threatened in any way during her work with the Mockus campaigns in 1994 and 1997.
In June 1999, Silva came to the United States on a tourist visa. She stayed for one month and then returned to Colombia. After her return to Colombia, Silva again worked for Mockus in his second successful campaign for mayor of Bogotá. In September 1999, while Silva was participating in one of the “health brigades,” she was handed a “condolence note” that said “Luz Marina Silva rest in peace for doing what she shouldn’t be doing in the wrong place.” Silva stated that the note, which she neither reported to authorities nor kept, was signed by the FARC. Silva stated that, after she received the “condolence note,” she received anonymous telephone calls. On one occasion, an anonymous caller told Silva that she was a target because her family “had always exploited the Colombian people.” Another caller said Silva was a target because she, unlike other members of her family, did not have a bodyguard. Silva did not testify that any of the calls mentioned her politics.
On October 9, 1999, about three weeks after Silva received the “condolence note,” two men on motorcycles followed Silva home from the restaurant she owned, and during the trip, they fired gun shots into her car. The shots hit the back window of Silva’s car, but she was not injured. That night, Silva received a telephone call and the caller warned her not to report the shooting to the Colombian authorities. The caller did not identify himself.
Although Silva first speculated that the FARC was responsible for the shooting, Silva later admitted that she did not know who fired the shots or made the phone call or why the shots were fired. Silva testified that the last time she participated in politics was a few days before the October 9, 1999, shooting. Silva testified that she had no further threats, calls, or other problems after October 9, 1999, until she came to the United States in November 1999.
Silva stayed in the United States from November 1999 until January 2000, but did not seek asylum. Silva then chose to return to Colombia to visit a dying relative. Silva testified that she “thought enough time had elapsed and that [she] could go back, that things might be different.” After her return to Colombia, Silva again began receiving anonymous telephone calls “daily,” in which the callers said, in an apparent reference to the shooting of Silva’s car, “we missed already once, don’t provoke us again” and “we are not going to miss a second time, we’re going to kill you.” Silva speculated that by “provoke” the anonymous callers meant that she should not be in Colombia or return to Colombia from the United States.
*1235 Silva did not testify that any of the new anonymous telephone calls referenced her political activity, and there is no evidence that Silva engaged in any political activity in 2000. Apart from the anonymous telephone calls, Silva did not have any problems in Colombia after she returned. Silva did not report the calls in 2000 to the police. She testified that her cousin, who was secretary to Mockus, also received anonymous telephone calls and that people in all of Colombia received letters and telephone calls calculated to terrorize them. She speculated that people get letters and phone calls if “the person that’s involved in some political group or is the first time doing something that they are not in — that they don’t want this person to do for whatever reasons.” Silva returned to the United States in March 2000, about two months after she had returned to Colombia. Silva’s hearing testimony is attached as Appendix B to the dissenting opinion.
In addition to Silva’s oral testimony and asylum application, the record before the Immigration Judge contained Silva’s written application for asylum and the 2000 Country Report on Human Rights Practices for Colombia. The Country Report noted that, in 2000, the Colombian “Government continued to face serious challenges to its control over the national territory, as longstanding and widespread internal armed conflict and rampant violence — both political and criminal — persisted.” The Country Report recounted multiple stories of widespread violence and indiscriminate attacks against citizens, both military and civilian.
Also part of the record was the Colombia-Profile of Asylum Claims and Country Conditions, which states that “[t]he vast majority (perhaps as high as 90 percent) of asylum claims from Colombia are based on political grounds even in cases where there is little evidence that the political views of the applicant are related to the mistreatment alleged.” The Profile states, “often applicants express uncertainty about the identity and/or motivation of their alleged abusers.” The Profile concludes that “[bjecause of the violent nature of the narcotics traffickers and guerrillas whose activities and agenda are often influenced by the availability of drug money, almost any abuse alleged by asylum applicants from Colombia could have occurred or at least would not be inconsistent with the country conditions.”
At the close of Silva’s testimony, the Immigration Judge found that Silva had established neither that she had been persecuted in the past nor that she had a well-founded fear of persecution on account of a protected ground if she returned to Colombia. The Immigration Judge found that the threats Silva received could not be classified as persecution. The Immigration Judge also found that, although the shooting incident could be classified as persecution, Silva did not know who shot at her or why. The Immigration Judge recognized that conditions in Colombia were violent, but stated that “everybody in Colombia suffers under these general- conditions of violence and criminal activity.” The Immigration Judge did not make an adverse credibility finding. The decision of the Immigration Judge is attached as Appendix C to the dissenting opinion. Silva appealed to a three-judge panel of the Board of Immigration Appeals, which affirmed the decision of the Immigration Judge without opinion. Silva petitioned for review and is represented by counsel on appeal.
II. STANDARD OF REVIEW
When the Board of Immigration Appeals adopts the decision of the Immigration Judge without opinion, we review the decision of the Immigration Judge. Al *1236 Najjar v. Ashcroft, 257 F.3d 1262, 1284 (11th Cir.2001). We review legal issues de novo. Mohammed v. Ashcroft, 261 F.3d 1244, 1247-48 (11th Cir.2001). This Court reviews “administrative fact findings under the highly deferential substantial evidence test.” Adefemi v. Ashcroft, 386 F.3d 1022, 1026 (11th Cir.2004) (en banc), cert. denied, 544 U.S. 1035, 125 S.Ct. 2245, 161 L.Ed.2d 1063 (2005). We must affirm the decision of the Immigration Judge if it is “ ‘supported by reasonable, substantial, and probative evidence on the record considered as a whole.’ ” Sepulveda v. U.S. Att’y Gen., 401 F.3d 1226, 1230 (11th Cir. 2005), superseding 378 F.3d 1260 (11th Cir.2004) (quoting Al Najjar, 257 F.3d at 1284); Adefemi, 386 F.3d at 1027 (quoting same). Thus, we do not engage in a de novo review of factual findings by the Immigration Judge. Adefemi, 386 F.3d at 1027.
“[Findings of fact made by ... the [Immigration Judge] may be reversed by this [C]ourt only when the record compels a reversal; the mere fact that the record may support a contrary Conclusion is not enough to justify a reversal of the administrative findings.” Id.-, 8 U.S.C. § 1252(b)(4)(B) (“[T]he administrative findings of fact are conclusive unless any reasonable adjudicator would be compelled to conclude to the contrary.”). “[W]e view the record evidence in the light most favorable to the agency’s decision and draw all reasonable inferences in favor of that decision.” Id. Under this highly deferential standard of review, we may not “ ‘reweigh the evidence’ from scratch.” Mazariegos v. Office of U.S. Att’y Gen., 241 F.3d 1320, 1323 (11th Cir.2001) (quoting Lorisme v. INS, 129 F.3d 1441, 1444-45 (11th Cir.1997)).
III. DISCUSSION
Silva makes three main arguments on appeal. First, Silva argues that the evidence compels the conclusion that she suffered past persecution and, in the alternative, she had a well-founded fear of future persecution on account of her political opinion. Second, Silva argues that she is entitled to withholding of removal because she established a clear probability that her life would be endangered if she was returned to Colombia. Third, Silva argues that the Board of Immigration Appeals violated its regulations when it affirmed without opinion the decision of the Immigration Judge, who allegedly committed other procedural errors. We review each argument in turn.

A. Viewed in the Light Most Favorable to the Fact Findings of the Immigration Judge, the Record Does Not Compel the Conclusion That Silva Was Entitled to Asylum.

“To establish asylum eligibility based on political opinion or any other protected ground, the alien must, with credible evidence, establish (1) past persecution on account of her political opinion or any other protected ground, or (2) a ‘well-founded fear’ that her political opinion or any other protected ground will cause future persecution.” Sepulveda, 401 F.3d at 1230-31. Each avenue of asylum relief requires proof of two criteria. To establish asylum based on past persecution, the applicant must prove (1) that she was persecuted, and (2) that the persecution was on account of a protected ground. See id. To establish eligibility for asylum based on a well-founded fear of future persecution, the applicant must prove (1) a “subjectively genuine and objectively reasonable” fear of persecution, Al Najjar, 257 F.3d at 1289, that is (2) on account of a protected ground, see Sepulveda, 401 F.3d at 1230-31.
Before we review the details of the record, we must recall how our standard of *1237 review governs our reading of this record. Our task is not to determine whether the inferences Silva draws from her version of events are reasonable. We do not deny, for example, the reasonableness of Silva’s contention that the written threat, the anonymous phone calls, and the shooting were all related, but that is not what we are asked to consider. Our review is more limited. The Immigration Judge found that Silva failed to prove her entitlement to asylum, and our task is to review the decision of the Immigration Judge under the highly deferential substantial evidence test: we must affirm if the decision of the Immigration Judge is “supported by reasonable, substantial, and probative evidence on the record considered as a whole.” Al Najjar, 257 F.3d at 1284. With that highly deferential standard in mind, we review the evidence Silva presented in the light most favorable to the findings of the Immigration Judge.
Silva testified about four categories of events in support of her asylum application. First, Silva testified that in September 1999 she received a “condolence note” signed by the FARC, which stated “Luz Marina Silva rest in peace for doing what she shouldn’t be doing in the wrong place.” Second, Silva testified that she received anonymous threatening telephone calls after receiving the “condolence note.” Third, Silva testified that two men on a motorcycle shot into her ear and hit the back window on October 9, 1999. She testified that she received an anonymous telephone call about the shooting that night but that she did not have any further problems until she left Colombia in November 1999. Fourth, Silva testified that, when she returned to Colombia in January 2000, she received more anonymous threatening telephone calls that referenced the shooting incident. We examine these events in turn.
We first conclude that the “condolence note” Silva received was on account' of her political activity, but this one incident is not sufficient to entitle Silva to asylum. “[P]ersecution is an extreme concept, requiring more than a few isolated incidents of verbal harassment or intimidation^]” Sepulveda, 401 F.3d at 1231 (internal quotation marks and citation omitted). The “condolence note” was an example of harassment and intimidation, but not persecution. The “condolence note” alone did not entitle Silva to asylum.
Second, Silva’s testimony regarding the anonymous telephone calls she received, beginning in September 1999 until the shooting incident on October 9, 1999, does not compel the conclusion that Silva was persecuted on account of her political opinion. Although the timing of the telephone calls supports an inference that the calls were related to Silva’s political activity, the evidence also supports an inference that the calls were unrelated to that activity. The record reflects that the anonymous callers, whom Silva testified were “different people always,” gave Silva different messages, and Silva did not testify that any of the messages referenced her political activity. Furthermore, although Silva testified that she engaged in political activity in Mockus’s campaigns-in 1994 and 1997, she did not testify that she was threatened in any way during her work with those campaigns and health brigades. Silva’s past extensive political participation without threatening calls or other harassment, along with the lack of reference to politics in the calls in 1999, supports the inference that those calls were not about Silva’s political activity. In addition, as with the “condolence note,” the receipt of anonymous threats in September and October 1999, without more, does not qualify as persecution, because “[m]ere harassment does not amount to persecution.” *1238 Sepulveda, 401 F.3d at 1231 (quoting Gonzalez v. Reno, 212 F.3d 1338, 1355 (11th Cir.2000)).
Third, we assume, for the sake of argument, as the Immigration Judge did, that the shooting would qualify as persecution, but Silva’s evidence does not compel the conclusion that the shooting was connected to her political activity. Silva testified that she did not know who shot at her car or why. The Immigration Judge reasonably took that candid and powerful admission at its face value.
Again, although the timing of the shooting would allow an inference that it was related to the “condolence note,” the record does not compel that conclusion. Substantial evidence also allows an inference, as the Immigration Judge found, that the shooting incident, for which Silva had no explanation, did not distinguish her from the majority of Colombians who are also subject to the general conditions of violence and criminal activity in Colombia. Both the Colombian Country Report and the Country Profile are replete with descriptions of widespread and indiscriminate violence. Silva testified that some of the anonymous calls before the shooting were about her family exploiting the Colombian people and her not having a bodyguard, that she did not know who shot at her or why, and that Colombians routinely suffer similar incidents of terroristic threats and violence. We are required to view all of this evidence in the light most favorable to the findings of the Immigration Judge, Adefemi, 386 F.3d at 1027, and in that light, we cannot say the shooting was indisputably related to Silva’s political activity.
Silva testified credibly about these events, but it is not clear from the record that even Silva believed, at the time of the shooting, that it was related to her political activity. After the shooting, Silva remained in Colombia for almost a month and a half with no further difficulties. Silva came to the United States on November 21, 1999, and stayed to January 2000 but did not seek asylum. Silva then returned to Colombia for a few months before returning to the United States in March 2000. Even then, Silva did not seek asylum until a year later. We do not doubt Silva’s sincerity in applying for asylum in March 2001, but her actions in 1999 and 2000 do not comport with the actions of an individual who believed at that time that she was a target of political persecution. It is reasonable to infer from Silva’s actions that the allegedly “compelling” connection between the shooting and her political activity was not immediately apparent even to Silva.
The final events about which Silva testified involve the anonymous telephone calls from January to March 2000, but Silva’s testimony about these calls did not establish that they were about her political opinion or anything more than harassment. Silva testified that the anonymous callers referenced the October shooting incident, but she did not testify that any of the callers mentioned politics. Silva also acknowledged that she had not participated in any political activity since before the shooting and that she did not report any of the calls to the police. Apart from the telephone calls, Silva did not have any other problems in 2000.
Although Silva’s testimony does not compel the conclusion that the anonymous calls in 2000 were on account of her political opinion, the timing and substance of those calls do support an inference that the earlier shooting was not about Silva’s political activity. Silva received the calls even though she had not been involved in politics for at least three months. The calls referenced the shooting incident, but Silva offered no evidence that any of the calls referenced politics. The references *1239 to the shooting incident, without any mention of Silva’s political activity, which had ended several months earlier, suggest that the shooting incident was unrelated to Silva’s political activity. This inference is also supported by the fact that, in 1994 and 1997, when she participated in the Mockus campaigns and health brigades, Silva received no telephone calls, but from January to March 2000, when she was not participating in any political activity, Silva received calls that did not mention her political activity.
In sum, when we view the evidence in the light most favorable to the finding of the Immigration Judge, the record does not compel the conclusion that Silva suffered political persecution. Silva’s testimony compels the conclusion that the “condolence note” was on account of her political opinion, but this event does not qualify as persecution. Sepulveda, 401 F.3d at 1231. Although we assume, for the sake of argument, that the shooting incident qualifies as persecution, apart from closeness in time, Silva did not offer any evidence to connect the shooting with the “condolence note” or her political activity in general. The record does not compel the conclusion that the shooting was on account of her political activity. Similarly, the record does not compel the conclusion that the harassing, anonymous telephone calls Silva received were on account of her political opinion.
Silva also failed to establish a well-founded fear of future persecution if she returned to Colombia. Silva failed to establish that she will be singled out on account of her political opinion or the opinions of her family. Because the record does not compel the conclusion that the past treatment to which Silva was subjected was on account of her political opinion, Silva’s subjective fear of future persecution is not objectively well-founded.
Our decision in Sepulveda, where the asylum applicant allegedly feared persecution at the hands of the other main Colombian guerilla group, ELN, is instructive. Sepulveda “participated in approximately ten peace marches” and personally assisted in hostage negotiations “between the kidnappers and the hostages’ families.” Sepulveda, 401 F.3d at 1229. We concluded that evidence of specific threats against Sepulveda, delivered both by telephone and to her family members, as well as a bombing of the restaurant where Sepulve-da worked, did not require that we grant her petition for review. As to the bombing incident, we explained, “Although the evidence may permit a conclusion the restaurant bombing was directed at Sepulveda on account of her political activity, it does not compel such a conclusion.” Id. at 1231. We also ruled that “the menacing telephone calls and threats to her, her brother, and other members of the university group do not rise to the level of past persecution that would compel reversal of the IJ’s decision.” Id. The Sepulveda decision illustrates that only in a rare ease does the record compel the conclusion that an applicant for asylum suffered past persecution or has a well-founded fear of future persecution. Silva’s petition does not present that rare case.
The dissent accuses the majority of deconstructing the evidence to reach its decision, but the dissent uses a vivid imagination to draw inferences in favor of Silva and ignore competing inferences that favor the findings of the Immigration Judge, contrary to our deferential standard of review. Because imaginative inferences are all that support its opinion, the dissent is left in the position of one who, trying to fill a leaky bucket with water, must first plug all the holes. Silva’s testimony is full of holes, and the dissent impermissibly draws inferences in Silva’s favor to plug those holes.
*1240 The prime example of the dissent drawing an inference in favor of Silva that is not compelled by the record is the inference of a connection between the condolence note, the shooting, and anonymous telephone calls. Silva admitted she did not know the identity or motivation of the shooters, and the Country Reports and Profile established that random threats and acts of violence are common in Colombia without regard to the victim’s political opinion. Silva also had been involved in politics for several years without receiving any threats. Silva did not testify that any of the anonymous calls she received in 1999 and 2000 mentioned her politics, and the calls in 2000 were received several months after Silva ended her political activity. There was a connection between the anonymous calls and the shooting, but neither the calls nor the shooting were necessarily related to Silva’s politics. Although the Immigration Judge, in the absence of direct evidence of the reasons for the shooting, plausibly inferred that the shooting may not have been based on Silva’s political opinion, the dissent draws the opposite inference in favor of Silva.
Another problem with the inferences drawn by the dissent is that they are based invariably on Silva’s ambiguous application for asylum rather than her specific testimony at her hearing in response to questions asked by the Immigration Judge. Although Silva’s testimony was consistent with her asylum application, her testimony added context and greater detail to the cursory facts alleged in her application, and her testimony exposed substantial deficiencies in her claim to asylum.
Silva’s petition presents an atypical contrast between a written application for asylum and later testimony by the applicant at a hearing. Often an applicant for asylum will fail to allege in his written application specific and credible facts to support an inference of persecution, but when that applicant later testifies, at a hearing before an immigration judge, the applicant will allege facts that, if true, compel an inference of persecution. In many cases, the Immigration Judge will find that the applicant’s testimony is incredible, and the Immigration Judge will base that adverse credibility determination on the inconsistencies between the earlier written application and the applicant’s later testimony. See, e.g., Forgue v. U.S. Att’y Gen., 401 F.3d 1282, 1285 (11th Cir.2005); D-Muhumed v. U.S. Att’y Gen., 388 F.3d 814, 819 (11th Cir.2004). Silva, in contrast, wrote allegations in her application for asylum that, without more, supported an inference of persecution on account of her political opinion, but when Silva later testified credibly and in greater detail about those facts, at her asylum hearing, she provided ample grounds for finding that she had not suffered persecution based on her political opinion.
A good example of the contrast between Silva’s conclusory written application and her later and more specific testimony involved the identity of her persecutors. Silva’s written application stated, without qualification, that the FARC called her and tried to kill her, but when asked about those facts at her hearing, Silva admitted that she did not know who was responsible for the telephone calls or the shooting:
Q. Who were these two people, do you know?
A. No.
Q. Why did they shoot you, shoot at you, do you know?
A. I have no idea but days before I was receiving — they were calling me anonymous phone calls.
Another example of this contrast involves Silva’s account of the timeline of events and her travel to the United States. Silva’s application did not mention her trip to the United States in November 1999 or *1241 that the threatening telephone calls ceased for almost a month and a half before she left Colombia in 1999, but at her hearing Silva testified that she came to the United States on November 21, 1999, and returned to Colombia in January 2000. She also testified that she had no further problems after the shooting before she came to the United States in November:
Q. So what you did was you came to the United States the next month?
A. Yes, in November.
Q. Between that — up to November of 1999 had you had any other problems?
A. No, no, no.
A third example of the contrast between Silva’s speculative application and later testimony involves the contents of the telephone calls she received. Silva stated in her application that the FARC called her and wanted her to stop her visits to the poor neighborhoods, but when she was given the opportunity at her hearing to describe the telephone calls Silva’s details did not support an inference of political persecution. Silva testified that she did not know who the callers were. Silva also described specific statements in the telephone calls about the wealth of her family, the shooting incident, and the absence of a bodyguard for her, but Silva never mentioned that any of the anonymous telephone calls, either before or after the shooting, referenced her political activity.
In the light of the gaps in Silva’s testimony and her evident lack of knowledge regarding either the alleged persecutors or the reason why she was allegedly persecuted, the dissent relies on conelusory statements in Silva’s asylum application rather than her more specific testimony to bolster its opinion. Although Silva’s testified at her hearing about the content of the telephone calls, but did not mention politics, the dissent, for example, quotes from Silva’s asylum application in which she asserted that the callers wanted her to “stop with my visits to these neighborhoods.” The dissent uses that assertion about the presumed intent of the callers, which Silva did not mention at her hearing, to supply an inference that the telephone calls were expressly related to Silva’s political activity.
Another example of the dissent’s generous use of Silva’s conelusory application rather than her specific testimony involves the timeline of events. Although Silva testified at her hearing that she had no problems after the day of the shooting and came to the United States over one month later, the dissent asserts that Silva “immediately began preparations to flee and actually left for the United States on November 21,1999.” Dis. Op. at 1247. The basis for this inference in favor of Silva is apparently a statement in Silva’s asylum application, in which she stated, in reference to the shooting, “From that moment on, I stopped all my activities and decided to leave the country which I did on March 8, [20]00.” This imagined version of events creates an inference of urgency that does not exist in Silva’s more specific testimony.
The dissent also reads the record in the light most favorable to Silva when it infers that the anonymous calls in January to March 2000 were related to political activity. Silva testified that the callers in January to March 2000 referenced the shooting, but she did not, even when asked what the callers said, testify that any caller mentioned her politics:
Q. So you returned to Bogota when, in January of 2000?
A. Yes.
Q. Okay, and did you have any further problems after you returned to Bogota?
A. Yes.
Q. What happened?
*1242 A. I began to receive once again telephone calls from the urban group.
Q. Before the calls previous had been anonymous. Were these calls identified?
A. No. The same way, anonymous.
Q. What did they say?
A. We missed already once, don’t provoke us again. We missed on the 9th, we are not going to miss a second time, we’re going to kill you. A very rude, very obscene.
Although there is no evidence that these calls in 2000 were related either to Silva’s politics, or the “condolence note,” or even the calls that preceded the shooting, the dissent draws an allegedly compelling inference in favor of Silva and treats the calls and these other events as unquestionably interrelated. Dis. Op. at 1246. The failure of the dissent to draw the reasonable inference, in favor of the finding of the Immigration Judge, that these events, in a country besieged by indiscriminate violence, intimidation, and crime, could be unrelated, is telling.
Finally, the dissent takes issue with the reliance by the majority and the Immigration Judge on the Colombian Country Report and Country Profile. The dissent argues that the majority fails to recognize “that the Country Profile indicates that much of the violence in Columbia is targeted at activities that are protected grounds.” Dis. Op. at 1247. The dissent quotes the Country Profile that “[F]our out of every ten murders are targeted for their involvement with political, labor, or social causes.” Id.
Again the dissent reads the record in the light most favorable to Silva. We agree that Colombia is a place where the awful is ordinary, but we must state the obvious: if four out of every ten murders are on account of a protected ground, six out of ten are not. The majority of the violence in Colombia is not related to protected activity. When an individual seeking asylum based on persecution does not know either the identity of the alleged persecutors or the reason for the persecution, the prevalence of random violent activity in Colombia, totally unrelated to any protected ground, allows a reasonable inference that the individual seeking asylum is the victim, not of political persecution, but of random violence. When we read the Colombian reports in the light most favorable to the finding of the Immigration Judge, as we must, the substantial evidence of non-political violent activity in Colombia supports the conclusion that Silva’s evidence, with its gaping holes and absence of proof, did not establish persecution on account of a protected ground.
Regarding our reference to our precedent in Sepulveda, the dissent wonders whether the petition of a successful applicant for asylum in our Court is like the fabled unicorn, but the dissent, as with its view of the evidence, misses the point about the scope of our review. It is a rare case that will compel reversal of the Immigration Judge for one fundamental reason: the Immigration Judge is in a superior position to make findings of fact. We do not reweigh the evidence presented to an Immigration Judge for sound reasons. Immigration Judges, not we, actually see and hear the applicants for asylum testify. Immigration Judges, not we, have personal encounters with applicants for asylum from Colombia who, like thousands of other Colombians, suffer real threats of violence. Immigration Judges, not we, are on the front lines everyday deciding whether the persecution suffered by an applicant for asylum meets the requirement of Congress that it be based on a protected ground. Our standard of review reflects the wisdom that Immigration Judges are in a better position to make that judgment call.
*1243 Although the law recognizes that the Immigration Judge who saw and heard Silva testify was in a superior position to make findings of fact, the dissent is able to find, in its search of the cold record before us, several facts that are not clear to us. First, the dissent finds the identity of the shooters even though Silva testified that she did not know them. Second, the dissent finds the motivation of the shooters even though Silva testified that she did not know their motivation. Third, the dissent finds the identify of the telephone callers that Silva described as anonymous. Fourth, the dissent finds that the calls were about Silva’s politics even though Silva did not describe a single reference to her political activities in the calls. Fifth, the dissent finds that the events involving a written threat, anonymous calls, and unknown shooters were all interrelated in a country where indiscriminate threats, crime, and violence are commonplace.
Whether we, like the dissent, would have made different findings, if faced with Silva’s application for asylum and live testimony, is irrelevant. When we view the record in the light most favorable to the Immigration Judge, we conclude that the denial of Silva’s application was supported by substantial evidence. We reject Silva’s petition for review of the denial of her application for asylum.

B. The Record Does Not Compel the Conclusion That Silva Was Entitled to Withholding of Removal.

To qualify for withholding of removal, Silva must have established that it is more likely than not that her life or freedom would be threatened on account of a statutorily protected factor if returned to Colombia. 8 U.S.C. § 1231(b)(3). “Where an applicant is unable to meet the ‘well-founded fear’ standard for asylum, [s]he is generally precluded from qualifying for either asylum or withholding of [removal].” Al Najjar, 257 F.3d at 1292-93 (citations omitted). Because Silva failed to establish eligibility for asylum, she likewise failed to establish entitlement to withholding of removal.

C. The Board of Immigration Appeals Obeyed Its Regulations When It Affirmed Without Opinion.

Silva’s final arguments relate to alleged procedural errors of the Immigration Judge and Board of Immigration Appeals. We defer to the interpretation of the regulations that govern the Board of Immigration Appeals if the interpretation by'the Board is reasonable and does not contradict the clear intent of Congress. Chevron U.S.A., Inc. v. Natural Res. Def. Council, Inc., 467 U.S. 837, 842-43, 104 S.Ct. 2778, 2781-82, 81 L.Ed.2d 694 (1984). If the decision of the Immigration Judge complies with the regulations, the issues in the case are not complex, and the issues are governed by existing precedent, then it is proper for the Board to affirm the decision of the Immigration Judge without opinion. Gonzalez-Oropeza v. United States- Att’y Gen., 321 F.3d 1331, 1333 (11th Cir.2003); see 8 C.F.R. § 1003.1(e)(4) (i).
Silva complains that the Board of Immigration Appeals affirmed without opinion, and the Immigration Judge failed to satisfy the standards of the Board for a reasoned decision, but these arguments fail. Nothing in this case required a written opinion by the Board of Immigration Appeals. The Immigration Judge did not commit material errors, and the clear issues presented by this case were governed by our previous decisions in Adefemi and Sepulveda.
IV. CONCLUSION
We deny Silva’s petition for review of the order for her removal.
PETITION DENIED.