[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
JULY 6, 2006
THOMAS K. KAHN
CLERK

_____

No. 05-17175
Non-Argument Calendar

_____

BIA No. A97-195-642

ROSA NELLY OROZCO,
RICAURTE DE JESUS FERNANDEZ,
ANA LUCIA FERNANDEZ,

Petitioners-Appellants,

versus

U.S. ATTORNEY GENERAL,

Respondent-Appellees.

_____

Petition for Review of a Decision of the
Board of Immigration Appeals

_____

**(July 6, 2006)**

Before MARCUS, WILSON and FAY, Circuit Judges.

PER CURIAM:

Rosa Nelly Orozco, the lead petitioner, along with husband Ricaurte De Jesus Fernandez (herein Fernandez), both Colombian nationals, and daughter, Ana Lucia Fernandez, a Colombian and Honduran national, petition for review of the Board of Immigration Appeals's (BIA) decision, adopting and affirming an Immigration Judge's (IJ) order of removal and denial of their asylum and withholding of removal claims, as well as relief under the United Nations Convention Against Torture (CAT). On appeal, Orozco argues that she should have been granted withholding of removal and asylum because substantial evidence demonstrated that she would be subjected to persecution if returned to Colombia. For the reasons set forth more fully below, we deny the petition in part and dismiss in part for lack of jurisdiction.

All of the petitioners arrived in the United States in 2000 as non-immigrant visitors with authorization to stay no longer than six months. After filing applications for asylum, each petitioner received a notice to appear, charging them with remaining in the United States for a longer time than permitted in violation of INA § 237(a)(1)(B), 8 U.S.C. § 1227(a)(1)(B). Their cases were later consolidated before an IJ, with Orozco being named as lead witness, and, therefore, lead petitioner.

Among the exhibits included with Orozco's asylum and withholding of removal application was the 2003 State Department Report on Human Rights

2

Practices for Colombia. The report states that an armed conflict continued to take place between the Colombian government and terrorist groups, including the ELN, resulting in somewhere between 3,000 and 4,000 civilian deaths. The ELN, along with the FARC, were responsible for a large percentage of those civilian deaths, kidnaped thousands of civilians, and also caused "massive" civilian displacement. The report further noted that the ELN and the FARC committed numerous politically motivated kidnapings. Membership in the ELN was estimated at about 3,500, smaller than the FARC, although the groups have acknowledged cooperating with one another. Overall, membership in terrorist groups declined because of strong pressure from the military. It was noted that membership in the ELN is considered a crime.

At a removal hearing, the petitioners, through counsel, admitted that their application for asylum was untimely, and, therefore, they only sought withholding of removal relief and relief under the CAT. Orozco, as lead witness, testified that she and her husband owned a factory in Medellin, Colombia, manufacturing "tubular furniture" that was sold all over the country, including a sizable contract with the municipality of Bello. She testified that she was not part of any groups or organizations, but was involved with the Conservative Party from a young age, helping to distribute leaflets in neighborhoods and helping to set up a health clinic. While she was not a member of the "Community Action," she attended the group's

meetings because she was a factory owner whose assistance had been requested. At one meeting, she requested funding to build a "micro company" that would create jobs for local youth. Her request was not denied, but there were not sufficient funds at that time.

At first, Orozco had no problems with the ELN, but she testified that the ELN began calling her because she "collaborated a lot with the municipality of Bello" and participated in politics. The first calls she received were at her factory sometime in 1998, and she testified that the calls were in relation to her fabrication of chairs for the municipality of Bello, for which she had a contract. The caller told her to stop collaborating with the mayor of Bello and politics, and while there were other phone calls, Orozco had the secretary answer them instead of taking them herself. Orozco testified that the secretary informed her that the ELN did not want Orozco to continue her political works or helping youth in the neighborhood because it hurt the ELN's recruiting efforts. Orozco further testified that she received calls at her home as well as her factory, finally filing a complaint on February 8, 1999, in the Bello prosecutor's office.

After filing her complaint, Orozco and her family decided to come to the United States for three months, hoping the situation would "calm down." They returned because they had their factory and apartment to tend to in Colombia, and her husband began returning to the factory, although not as frequently as before.

4

Orozco continued her work with the Conservative Party, distributing leaflets with information about the mayor of Bello and the Party in general. The same month that she returned from her three-month trip to the United States, Orozco began receiving calls from the ELN at her house and her factory. Orozco testified that her daughter answered one of the phone calls, and she was told to tell Orozco that if she didn't stop participating in politics, the ELN would kidnap one of her children or kill them all. Orozco and her family became very nervous, were afraid of "everything," and eventually sought psychological help. Orozco testified that she stopped going to Conservative Party meetings, but the ELN continued to make phone calls until she decided to move to the United States in 2000. She never had any personal contact with ELN members, but did testify that her son was attacked by six unknown individuals on motorcycles about two weeks before she came to the United States.

Orozco also testified that she had not considered moving to another city within Colombia because she had never lived outside of Medellin, and if she could not live safely in Medellin, where she had lived for almost her entire life, she believed she would stand even less chance in another city where she didn't "known anyone" and she wouldn't know who was "next to [her]." If returned to Colombia, Orozco feared that the ELN would kidnap her daughters or kill her family. As for her factory, Orozco testified that she sold it after arriving in the United States, but

still has three half-sisters who reside with her mother in Colombia.

On cross-examination, Orozco testified that she had never personally come in contact with an ELN member, and although many different people came to her factory, she did not know if any of them were ELN members. Orozco did, however, believe that her secretary had been truthful when she described the people coming to her factory as being ELN members. Orozco testified that her family, while not physically harmed, had to see a psychologist, and it was unknown whether the assault on her son was the result of guerilla action. She stated that the ELN never asked her for money and only told her to stop her activities with the Conservative Party and politics. Orozco further admitted that she had been making chairs at her factory for the municipality of Bello and its mayor since 1984, but never received any guerilla threats until 1999. She believed that her family was not harmed because they did not leave their apartment except to visit the psychologist. Since being in the United States, Orozco's daughter had not seen a psychologist because she had calmed down and been happy.

The IJ rendered an oral decision and first found that Orozco had testified credibly and consistently with her application regarding her work with the Conservative Party and the filing of complaints regarding threats that she had received. Noting that threatening phone calls alone could, in some cases, rise to the level of persecution, the IJ found that the phone calls in this case did not rise to

such a level, and, therefore, the IJ found that Orozco was not entitled to a presumption of past persecution. As to the beating of Orozco's son, the IJ found that the men who conducted the beating were unidentified and Orozco could not state whether the men were members of the ELN. The IJ further found that, given the amount of time Orozco had been outside of Colombia, she would not more likely than not be subject to persecution if returned to Colombia, either in Medellin, or any other part. The IJ found that there was no indication that the ELN had continued to seek out the petitioners following their departure from Colombia and nothing on the record to indicate that they would be singled out if returned to any other part of Colombia. The IJ further noted that the ELN was not the strongest of the guerilla organizations and was not as widespread throughout Colombia's municipalities as was the FARC. Thus, the IJ found that it did not appear as though Orozco and her family could not return to Colombia and relocate somewhere that they were not likely to be contacted, especially in light of the fact that no other family member had been persecuted and Orozco had never held a high-profile position within the Conservative Party and limited her activities to Bello and Medellin. Based on the foregoing, the IJ concluded that Orozco had failed to meet her high burden of proof for withholding of removal or CAT relief, but did, however, find that Orozco was qualified to depart voluntarily.

Orozco appealed the IJ's decision, and the BIA adopted and affirmed the IJ's

decision, specifically the findings that Orozco was time-barred from filing for asylum and had failed to establish either past persecution or that it was more likely than not that she would be persecuted by the ELN on account of her Conservative Party activities if returned to Colombia.

When the BIA issues a decision, we will review only that decision, except to the extent the BIA expressly adopts the IJ's decision. Chacon-Botero v. U.S. Att'y Gen., 427 F.3d 954, 955 (11th Cir. 2006). "Insofar as the [BIA] adopts the IJ's reasoning, we will review the IJ's decision as well." Id. (citation omitted). Where, as here, the BIA expressly adopts the IJ's reasoning and briefly articulates its reasons for doing so, we will review the decisions of both the IJ and the BIA. Id.

Orozco argues on appeal that the IJ and BIA erred because the evidence showed that it was more likely than not that she would be persecuted if she returns to Colombia. She further argues that she was entitled to asylum because she has a well-founded fear of future persecution from the ELN.[1] In support, Orozco points to the evidence of the ELN's threatening phone calls to her place of business and home, as well as the ELN's ability to know when she had returned to Colombia after spending three months in the United States. Orozco then cites evidence not

_____

[1] The petitioners conceded that their applications for asylum were not timely filed, and both the BIA and the IJ found that their applications for asylum were filed more than one year after they entered the United States, and, therefore, found that their asylum claims were time-barred. We lack jurisdiction to review the timeliness of an asylum application, and, therefore, we dismiss the claim for lack of jurisdiction. See Chacon-Botero, 427 F.3d at 956-57.

8

before either the BIA or the IJ to argue that, even if the ELN was not capable of persecuting her country-wide, it was likely that the FARC would target her for the same reasons as the ELN. Finally, she argues that the country-wide civil strife, combined with the widespread presence of guerillas, proves that she was entitled to withholding of removal from Colombia.

To the extent that the IJ's decision was based on a legal determination, review is de novo. Mohammed v. Ashcroft, 261 F.3d 1244, 1247-48 (11th Cir. 2001). The IJ's factual determinations are reviewed under the substantial evidence test, and this Court "must affirm the [IJ's] decision if it is 'supported by reasonable, substantial, and probative evidence on the record considered as a whole.'" Al Najjar v. Ashcroft, 257 F.3d 1262, 1283-84 (11th Cir. 2001) (citation omitted). Thus, factual determinations "may be reversed by this court only when the record compels a reversal; the mere fact that the record may support a contrary conclusion is not enough to justify a reversal of the administrative findings." Adefemi v. Ashcroft, 386 F.3d 1022, 1026 (11th Cir. 2004) (en banc), cert. denied, 125 S.Ct. 2245 (2005).

Pursuant to INA § 241(b)(3)(A), 8 U.S.C. § 1231(b)(3)(A), the Attorney General:

> [M]ay not remove an alien to a country if the Attorney General decides that the alien's life or freedom would be threatened in that country because of the alien's race, religion, nationality, membership

9

in a particular social group, or political opinion.

INA § 241(b)(3)(A), 8 U.S.C. § 1231(b)(3)(A).  The burden of proof is on the applicant to establish that she would face persecution on account of one of the five covered grounds upon return to the proposed country of removal.  See 8 C.F.R. § 208.16(b).  If the applicant is determined to have suffered past persecution in the proposed country of removal, a rebuttable presumption arises that her life or freedom would again be threatened upon removal to the proposed country.  8 C.F.R. § 208.16(b)(1)(i).

In order to rebut the presumption, the INS can show, by a preponderance of the evidence, that (1) there has been a fundamental change in circumstances such that the applicant's life or freedom would not be threatened on any of the five enumerated grounds in the country of removal; or (2) the applicant could avoid a future threat by relocating within the proposed country and that it would be reasonable to expect her to do so.  8 C.F.R. §§ 208.16(b)(1)(i)(A)-(B).  If an applicant has failed to prove past persecution, or failed to show that her fear of future persecution is related to her past persecution, then the inquiry shifts to whether an applicant has demonstrated that, if returned to the country of removal, it is "more likely than not" that she will be persecuted on account of one of the five enumerated grounds.  8 C.F.R. §§ 208.16(b)(iii), (b)(2).  However, "an alien cannot demonstrate that he more-likely-than-not would be persecuted on a protected

10

ground if the IJ finds that the alien could avoid a future threat by relocating to another part of his country." See Mendoza v. U.S. Att'y Gen., 327 F.3d 1283, 1287 (11th Cir. 2003).

We conclude that substantial evidence supports the BIA's and IJ's conclusion that Orozco failed to establish her eligibility for withholding of removal. The only evidence in support of Orozco's claims were threats made by the ELN and an attack on her son by unidentified persons. As the attack on her son cannot be tied one way or the other to either her political activity or to the ELN, the record does not compel a reversal on that ground. Furthermore, while the INA does not expressly define "persecution" for purposes of qualifying as a "refugee," we have discussed other circuits holdings that "'persecution' is an 'extreme concept,' requiring 'more than a few isolated incidents of verbal harassment or intimidation,' and that '[m]ere harassment does not amount to persecution.'" Sepulveda v. U.S. Att'y Gen., 401 F.3d 1226, 1231 (11th Cir. 2005). In Sepulveda, we held that the bombing of the petitioner's restaurant in addition to threats to her brother, herself, and her university group were insufficient to show past persecution for purposes of asylum. Id. at 1231. Moreover, the petitioner was unable to show a well-founded fear of future persecution because the record did not compel the conclusion that the ELN would single the petitioner out if she returned and because nothing suggested that the petitioner's "notoriety as an

activist" would outlive her four-year absence from Colombia. Id. at 1231-32.

Because the petitioner there was unable to meet the lower burden of proof for

asylum, she was unable to prove meet her higher burden of proof for withholding

of removal. Id. at 1232-33. As Orozco relies only on the phone threats of the

ELN, and she has been out of Colombia for six years at this point, four years at the

time of her removal hearing, the record, like the one in Sepulveda, does not compel

a different conclusion than the one reached by the BIA and the IJ.[2] Cf. Silva v.

U.S. Att'y Gen., No. 04-10351, manuscript op. at 17-18 (11th Cir. May 5, 2006)

(noting that Sepulveda indicates that it is rare for the record to compel a conclusion

that a petitioner suffered past persecution or had a well-founded fear of

persecution, and Silva's evidence of anonymous phone threats, condolence notes,

and a shooting that was not necessarily tied to her political activity, did not

establish that rare case).

Thus, we conclude that substantial evidence supports the BIA's and IJ's

findings that Orozco failed to establish that she was entitled to withholding of

removal and the record does not compel a reversal of those findings. Moreover,

we lack jurisdiction to review whether or not her asylum claim was timely filed,

and the petition is, therefore, dismissed as to her asylum claim. We, therefore,

---

[2] Orozco offers no argument regarding the denial of CAT relief, and, therefore, the argument is deemed abandoned. Sepulveda, 401 F.3d at 1228 n.2.

deny the petition in part and dismiss in part.

**PETITION DENIED, in part, DISMISSED, in part.**