[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
OCT 30, 2006
THOMAS K. KAHN
CLERK

_____

No. 06-11708
Non-Argument Calendar
_____

Agency No. A96-007-626

MARIA CLAUDIA CARDOZA,

Petitioner,

versus

U.S. ATTORNEY GENERAL,

Respondent.

_____

Petition for Review of a Decision of the
Board of Immigration Appeals

_____

**(October 30, 2006)**

Before TJOFLAT, BIRCH and BARKETT, Circuit Judges.

PER CURIAM:

Petitioner Maria Claudia Cardoza, a citizen of Colombia, seeks review of the

Board of Immigration Appeals's ("BIA") decision affirming the Immigration

Judge's ("IJ") order denying her application for asylum and withholding of

removal.[1]  The BIA held that Cardoza failed to establish past persecution or a well-

founded fear of future persecution based on a protected ground, and failed to show

that it is more likely than not that she will be persecuted in the future.  Because

substantial evidence supported the BIA's decision, we DENY Cardoza's petition.

## I.  BACKGROUND

Cardoza entered the United States at Miami, Florida, on 6 October 2002.

See AR at 266.  Cardoza admitted to the Immigration and Naturalization Service[2]

("INS") that she was a citizen and native of Colombia and that she had come to the

U.S. to apply for asylum.  Id. at 273-74.  She also admitted that she had overstayed

her visitor's visa the last time she had been in the country, and that she had paid

200,000 Colombian pesos to get a fraudulent back-dated stamp on her passport to

hide this fact.  Id. at 276.  She stated that she left Colombia because the Fuerzas

---

[1] In her application, Cardoza also sought relief from removal under the United Nations Convention Against Torture and Other Cruel, Inhuman, or Degrading Treatment or Punishment. Although the IJ and BIA denied such relief, she does not raise this issue on appeal.  Accordingly, this issue is waived.  Sepulveda v. U.S. Att'y Gen., 401 F.3d 1226, 1228 n.2 (11th Cir. 2005) (per curiam).

[2] On 25 November 2002, President Bush signed into law the Homeland Security Act of 2002, Pub. L. No. 107-296, 116 Stat. 2135 ("HSA").  The HSA created a new Department of Homeland Security ("DHS"), abolished the INS, and transferred its functions to the new department.  Because this case was initiated while the INS was still in existence, however, we refer to the agency as the INS rather than the DHS.

Armadas Revolucionarias de Colombia ("FARC") guerillas had been threatening to kill her family since 1998, and she feared returning to Colombia. Id. at 276, 278.

At a credible fear interview, Cardoza testified that she "was involved with" the Liberal Party in Colombia, that she "help[ed] peasants and farmers in the rural areas with various activities[,] includ[ing] farming, education, etc.," and that the FARC threatened to harm her if she continued to help the farmers. Id. at 268. She further testified that her husband was a police officer, and that the FARC also wanted to harm her and her husband "because he refused to provide them with information about police operations." Id. Finally, she stated that in December 1998, "several men went to [her] house" looking for her and her husband and beat her mother. Id.

The INS subsequently issued a Notice to Appear ("NTA") to Cardoza. Id. at 287-88. The NTA charged that Cardoza was removable pursuant to INA § 212(a)(6)(C)(i), 8 U.S.C. § 1182(a)(6)(C)(i), as "an alien who, by fraud or willfully misrepresenting a material fact, [sought to procure] admission into the United States." Id. The NTA also charged that she was inadmissible pursuant to INA § 212(a)(7)(B)(i)(II), 8 U.S.C. § 1182(a)(7)(B)(i)(II), "because [she was] a nonimmigrant who [was] not in possession of a valid nonimmigrant visa or border crossing identification card at the time of application for admission into the United

3

States." Id.

On 10 June 2003, Cardoza filed an application for asylum and for withholding of removal. See id. at 216-17. She sought asylum based on her political opinion and her membership in a particular social group. Id. at 216-20. Her asylum application contained many of the same allegations Cardoza made in her credible fear interview, including persecution by the FARC due to her political activity in the Liberal Party and her husband's employment as a police officer. Id. She also stated that she was persecuted because her daughter was born in the United States, and the FARC had designated her daughter a military target, as they had all U.S. citizens. Id.

At her removal hearing, Cardoza admitted to proper service and receipt of the NTA and admitted all but one of the allegations and the second charge. Id. at 72-73. The IJ found that the charge Cardoza did not concede was true "based on her admissions." Id. at 73. Cardoza also submitted copies of a number of documents, including her membership card in the Liberal Party, dated 30 March 2000.[3] Id. at 161-62. However, the IJ found that this evidence was untimely under the immigration court's local rules, and did not admit the documents into evidence.

---

[3] On cross examination by the government at her removal hearing, Cardoza admitted that she obtained the Liberal Party membership card in 2002 while living in the United States, and that the card had been backdated.

4

Id. at 89-97.

Cardoza testified that in 1990, while living in Bogota, she joined the Liberal Party. Id. at 104-05. After that, she visited Tolima every two or three weeks. Id. at 105. There she "participated in . . . political activities, . . . checking the IDs of the peasants and telling them where they had to go to vote" and organizing education for "the peasants" in "agricultural techniques for better farming." Id. at 106-07.

In response to questions regarding when the threats from the FARC began, Cardoza stated the threats "[had] always been there more or less since 1986." Id. at 106. However, when questioned again she stated that they began in 1998. Id. at 108. When this discrepancy was pointed out to her, she stated that "the threats [had] always been there since 1982, when two of my brother's cousins were kidnaped" and taken to a distant village by the FARC, never to be seen again. Id. at 109-11. She further testified that, in 1986, when her stepfather died, the guerillas wanted to take Cardoza's stepfather's four children. Id. at 111. To avoid this, her family took the children to the Bogota. Id..

When asked about the next time she had contact with the FARC, Cardoza testified that in 1998, prior to her first trip to the United States, she began receiving threatening phone calls at her home in Bogota. Id. at 112. She stated that the first time the FARC called her, they told her that "it would go well" for her if her

5

husband at the police station helped them. Id. at 113. In subsequent calls, the caller would simply tell Cardoza that they were going to kill her. Id. at 113-14. Cardoza stated that she received approximately five such calls in 1998. Id. at 114. In addition to the phone calls, Cardoza testified that people to whom she delivered bread would tell her that "they had been asking about [her]." Id. at 112.

In response to the threats, and because she was pregnant and feared miscarrying, Cardoza traveled to the United States in July 1998. Id. at 105-06. She gave birth in November 1998, and in December 1998 she returned to Colombia after learning that her mother had been attacked her home in Bogota by FARC guerillas. Id. at 114-15. She testified that after her return, she received phone calls threatening to kill her and her family, and asking her to influence a local politician in Tolima with whom she was acquainted, Alvaro Esquivel, in order to help the guerillas. Id. at 116, 119-20.

Cardoza visited the United States for a second time in October 1999. Id. at 103, 122. During this period, her mother continued to live in Bogota, but traveled to Medellin and other places, sometimes alone and sometimes with Cardoza's brother. Id. at 122-23. Cardoza testified that she returned to Colombia in March 2002 and stayed in her house in Bogota with her mother, although she also traveled to Tolima where she sought medical treatment and conducted some personal business. Id. at 104, 126-27.

6

Cardoza testified that while in Colombia in 2002 she did not receive any phone calls in Bogota, but explained that the guerillas left a threatening pamphlet for her at the house in Tolima. Id. She also said that Esquivel told her the FARC were threatening both him and Cardoza because of their support of Alvaro Uribe's presidential campaign. Id. at 128-29. In addition, Esquivel told Cardoza that the FARC were threatening her daughter because her father was a policeman and because she was born in the United States. Id. at 128-29. When the IJ asked her how she could say that the FARC "really wanted to harm" her when she was able to travel and conduct business alone without being harmed, she stated that they were simply pressuring her because they wanted her to help them. Id. at 130. Cardoza also testified that her mother still lives in Bogota, in the same house, with two of Cardoza's brothers. Id. at 123-24.

Cardoza further testified that while in the United States on her third visit, she learned that both Esquivel and his wife had been killed by the FARC guerillas. Id. at 131-36. She testified that the FARC would still be interested in her, despite Esquivel's death, and explained that his death was simply a warning to everyone that they will "end up like [him]." Id. at 136-37.

In his oral decision, the IJ summarized the facts, noting a number of inconsistencies, as well as his "deep concerns" regarding the authenticity of Cardoza's Liberal Party membership card, and found that her testimony was "[a]t

7

times . . . rambling[,] vague[,] and often not specific to the question that was being posed to her," and that he had "serious questions" about her documentation. Id. at 55-56, 60-62, 66. The IJ found that Cardoza had "failed to establish [that] any fear that she had even at a subjective level existed on a countrywide basis." Id. at 64. The IJ noted the amount she traveled in Colombia, as well as her three trips to the United States, and noted that the only contact with the guerillas she had during the last trip was the pamphlet, the contents of which were unclear. Id. at 65. Based on Cardoza's testimony and the evidence submitted, the IJ found Cardoza failed to establish either past persecution or a well-founded fear of future persecution. Because she failed to establish the requirements for asylum, the IJ also found that she had failed to establish entitlement to withholding of removal. Id. at 67. Accordingly, the IJ ordered Cardoza removed. Id. at 68.

The BIA affirmed the IJ's decision. Specifically, the BIA found that Cardoza's testimony that she received several phone call threats and one threatening pamphlet but was never confronted personally or harmed by the FARC did not rise to the level of persecution. Id. at 3-4. Further, the BIA found that she had not established that she had a well-founded fear of future persecution, noting that (1) she had traveled back and forth between Colombia and the United States, but did not apply for asylum until June 2003, and (2) she had not supported her claim that the FARC would still want to "single her out for persecution

8

approximately 6 years after reportedly threatening her for the first time in 1998, and nearly 2 years after she last left the country in 2002." Id. at 4. Finally, the BIA found that, because she failed to meet the lower burden of proof for asylum, she also failed to satisfy the "clear probability" standard for withholding of removal. Id. Cardoza filed a timely petition for review with this court.

## II. DISCUSSION

### A. Standard of Review

Our review is limited to the BIA's decision, "except to the extent that it expressly adopts the IJ's opinion." Reyes-Sanchez v. U.S. Att'y Gen., 369 F.3d 1239, 1242 (11th Cir. 2004) (quoting Al Najjar v. Ashcroft, 257 F.3d 1262, 1284 (11th Cir. 2001)). We review legal issues de novo, Mohammed v. Ashcroft, 261 F.3d 1244, 1247-48 (11th Cir. 2001), and "administrative fact findings under the highly deferential substantial evidence test," Adefemi v. Ashcroft, 386 F.3d 1022, 1026-27 (11th Cir. 2004) (en banc), cert. denied, 544 U.S. 1035, 125 S. Ct. 2245 (2005). "Under the substantial evidence test, we view the record evidence in the light most favorable to the agency's decision and draw all reasonable inferences in favor of that decision." Id. at 1027. To reverse the BIA's factual finding, we not only must conclude that the record supports such a conclusion, but compels it. Id.

B. Credibility Determination

The IJ must determine the asylum applicant's credibility, and we may not substitute our judgment for the IJ's with respect to credibility findings. See Yang v. U.S. Att'y Gen., 418 F.3d 1198, 1201 (11th Cir. 2005) (citing Vasquez-Mondragon v. INS, 560 F.2d 1225, 1226 (5th Cir. 1977) (per curiam)). The IJ's credibility determination is a factual finding, and is reviewed under the substantial evidence test. See Alim v. Gonzales, 446 F.3d 1239, 1254 (11th Cir. 2006) (citing Al Najjar, 257 F.3d at 1283). Nonetheless, the IJ must support an adverse credibility determination with "specific, cogent reasons." Forgue v. U.S. Att'y Gen., 401 F.3d 1282, 1287 (11th Cir. 2005) (citing D-Muhumed v. U.S. Att'y Gen., 388 F.3d 814, 819 (11th Cir. 2004)).

In this case, the IJ characterized Cardoza's testimony as "[a]t times . . . rambling[,] vague[,] and often not specific to the question that was being posed to her," and declared that he had "serious questions" and "deep concerns" about the authenticity of some of the documents she had submitted. AR at 60-62, 66. While the IJ found Cardoza's testimony vague, and questioned certain documents submitted by her, the IJ's comments do not appear to amount to an express adverse credibility determination, leaving us "in the dark" on the matter. Yang, 418 F.3d at 1201. In such a situation, we should presume that credibility was not a dispositive issue. Id. In this regard, as the remainder of this discussion demonstrates, it was

10

not necessary for the IJ to discount any of Cardoza's testimony in order to deny her relief.

C.  Asylum

An alien who is present in or arrives in the United States may apply for asylum, which the Attorney General may grant if the alien is a "refugee" within the meaning of the INA.  See Sepulveda, 401 F.3d at 1230 (citing 8 U.S.C. § 1158(a)(1), (b)(1)).  The INA defines a refugee as:

> any person who is outside any country of such person's nationality . . . who is unable or unwilling to return to, and is unable or unwilling to avail himself or herself of the protection of, that country because of persecution or a well-founded fear of persecution on account of . . . political opinion . . . .

8 U.S.C. § 1101(a)(42)(A).  Thus, an alien may establish eligibility for asylum by demonstrating "(1) past persecution on account of her political opinion or any other protected ground, or (2) a 'well-founded fear' that her political opinion or any other protected ground will cause future persecution."  Sepulveda, 401 F.3d at 1230-31 (citing 8 C.F.R. § 208.13(a), (b)).  The burden of proving "refugee" status, and thereby establishing asylum eligibility, is the applicant's.  Id. at 1230 (citing Al Najjar, 257 F.3d at 1284).

1.  Past Persecution

"To establish asylum based on past persecution, the applicant must prove (1) that she was persecuted, and (2) that the persecution was on account of a protected

11

ground." Silva v. U.S. Att'y Gen., 448 F.3d 1229, 1236 (11th Cir. 2006) (citing Sepulveda, 401 F.3d at 1230-31). While the INA does not define the term "persecution," we have observed that "persecution is an extreme concept, requiring more than a few isolated incidents of verbal harassment or intimidation." Id. at 1237 (citing Sepulveda, 401 F.3d at 1231). "Not all exceptional treatment is persecution." Gonzalez v. Reno, 212 F.3d 1338, 1355 (11th Cir. 2000). In addition, the petitioner must demonstrate that the persecution is because of a statutorily protected ground; "evidence that either is consistent with acts of private violence or the petitioner's failure to cooperate with guerillas, or that merely shows that a person has been the victim of criminal activity, does not constitute evidence of persecution based on a statutorily protected ground." Ruiz v. U.S. Att'y Gen., 440 F.3d 1247, 1258 (11th Cir. 2006) (per curiam) (citing Sanchez v. U.S. Att'y Gen., 392 F.3d 434, 438 (11th Cir. 2004) (per curiam)).

Cardoza's evidence of past persecution consists of the episodes of threatening telephone calls, the threats conveyed to her through Esquivel, the pamphlet, the kidnaping of her relatives, and the attack on her mother. We have found that written threats and threatening telephone calls constitute mere harassment, not rising to the level of persecution. Silva, 448 F.3d at 1237-38. Moreover, Cardoza's testimony regarding the kidnaping of her cousins and the attack on her mother does not compel a finding of past persecution within the

12

meaning of the INA. Neither the kidnaping nor the attack were directed at Cardoza herself. Furthermore, both the attack and the kidnaping appeared to be isolated incidents, the kidnaping occurring in 1982, and the attack on Cardoza's mother occurring in 1998. Accordingly, the record does not compel this Court to reverse the BIA's finding that Cardoza failed to show past persecution.[4]

2. Well-Founded Fear of Future Persecution

Substantial evidence also supports the BIA's conclusion that Cardoza failed to establish a well-founded fear of future persecution. To demonstrate a well-founded fear of future persecution, an applicant generally must show (1) a "subjectively genuine and objectively reasonable" fear of persecution, (2) based upon a protected ground. Silva, 448 F.3d at 1236 (internal citations omitted). The fact that she had traveled in Colombia unmolested for years despite apparently being a target of the FARC for almost two decades, her low-level political participation, and the fact that she had been out of Colombia for over two years all undercut her argument that she has an objectively reasonable fear of future persecution. Further, the fact that Cardoza did not apply for asylum until 2003, and the fact that she was willing to go back to Colombia alone and travel and conduct business, undermine her assertion that she was subjectively afraid. Silva,

_____

[4]Because substantial evidence supports the BIA's finding that Cardoza failed to demonstrate past persecution, it is not necessary to address whether any such persecution occurred on account of a statutorily protected ground.

448 F.3d at 1236.

Cardoza argues that under 8 C.F.R. § 1208.13(b)(2)(iii), the BIA and IJ erred by requiring individualized evidence of a well-founded fear of future persecution. Under that section, the IJ may not require evidence that an asylum applicant would be singled out individually for persecution if the applicant establishes (1) a pattern or practice in her home country of persecution of a group of similarly situated persons on account of political opinion, and (2) her inclusion in the group. Cardoza argues that she has established a pattern or practice of persecution of Liberal Party members by the FARC, as well as her membership in the Liberal Party. We find that substantial evidence supports the BIA's finding to the contrary.

Cardoza testified that the FARC is "interested in all that have cooperated in the campaigns" in Colombia, A.R. at 136, and she cites the U.S. State Department's 2002 Country Report on Human Rights Practices for Colombia ("Country Report") for the proposition that Liberal Party supporters are subject to persecution by the FARC. While Cardoza's testimony may permit a finding that the FARC targets all politically active persons, it does not compel such a finding, nor does it compel a finding of a pattern or practice of persecution of Liberal Party members by the FARC. Moreover, the Country Report does not state that Liberal Party members are targeted by the FARC, and therefore it does not compel such a

14

finding. Because Cardoza has failed to establish a pattern or practice of persecution of a group of similarly situated persons within the meaning of section of section 1208.13(b)(2)(iii), we need not reach the question whether she has established her own membership in such a group.

D. Withholding of Removal

To qualify for withholding of removal, an alien must establish that it is more likely than not that her life or freedom would be threatened on account of a statutorily protected factor if returned to her home country. See Silva, 448 F.3d at 1243 (citing 8 U.S.C. § 1231(b)(3)). This is a more stringent standard than the "well-founded fear" standard required for asylum eligibility, and an applicant who is unable to meet the "well-founded fear" standard generally fails to qualify for either asylum or withholding of removal. Id. (citing Al Najjar, 257 F.3d at 1292-93). Accordingly, the BIA's denial of Cardoza's application for withholding of removal is supported by substantial evidence.

## III. CONCLUSION

Substantial evidence supports the BIA's conclusion that Cardoza did not suffer past persecution on the basis of a protected ground, that she does not have a well-founded fear of future persecution, and that she failed to show that it is more likely than not that she will be persecuted in the future. Accordingly, the BIA did

15

not err by denying Cardoza's application for asylum and withholding of removal.

**PETITION DENIED.**