[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
SEPT 29, 2006
THOMAS K. KAHN
CLERK

_____

No. 06-10578
Non-Argument Calendar

_____

Agency Nos. A79-090-159
A79-090-160

HELBERT URREA GOMEZ,
PAOLA ANDREA MONTOYA,
HELBERT ANDRES URREA MONTOYA,
RAQUEL ANDREA URREA MONTOYA,
MARGARITA MONTOYA PATINO,

Petitioners,

versus

U.S. ATTORNEY GENERAL,

Respondent.

_____

Petition for Review of a Decision of the
Board of Immigration Appeals

_____

**(September 29, 2006)**

Before BIRCH, BLACK and BARKETT, Circuit Judges.

PER CURIAM:

Helbert Urrea Gomez, Paola Andrea Montoya, Helbert Andres Urrea Montoya, Raquel Andrea Urrea Montoya, and Margarita Montoya Patino ("Petitioners"), natives and citizens of Colombia, through counsel, petition for review of the Immigration Judge's ("IJ's") order of removal and denial of asylum, withholding of removal, 8 U.S.C. §§ 1158, 1231(b)(3), and relief under the United Nations Convention Against Torture and Other Cruel, Inhuman, or Degrading Treatment or Punishment ("CAT"), 8 C.F.R. § 206.16. That order became the final agency determination when the Board of Immigration Appeals ("BIA") summarily affirmed the IJ's opinion without an opinion. Concluding that substantial evidence supports the BIA and IJ's conclusions, we DENY the petition.

## I. BACKGROUND

Helbert Urrea Gomez and Paola Montoya, who are married, their children Helbert and Raquel, and Paola's mother, Margarita Patino, are natives and citizens of Colombia and sought admission to the United States on 23 January 2001. They were issued notices to appear ("NTA") by the INS,[1] charging them with removability under 8 U.S.C. § 1182(a)(6)(C)(i), as aliens who by fraud or willful

---

[1] On 25 November 2002, President Bush signed into law the Homeland Security Act of 2002 ("HSA"), Pub. L. No. 107-296, 116 Stat. 2135. The HSA created a new Department of Homeland Security ("DHS"), abolished the INS, and transferred its functions to the new department. However, because this case was initiated while the INS was still in existence, this opinion refers to the agency as the INS rather than the DHS.

misrepresentation, sought admission to the United States, and 8 U.S.C. § 1182(a)(7)(A)(i)(I), as aliens who, at the time of their admission, did not possess valid entry documents.

On 2 October 2001, Urrea filed an application for asylum and withholding of removal.[2] Urrea claimed that he had been threatened by the Army of National Liberation ("ELN") on account of his membership in a social group and his political opinion. Urrea then explained that he had worked as a driver for the Colombian Army from 1992 until 25 December 2000. On 20 November 2000, he was driving soldiers when his truck encountered an ELN roadblock. A sergeant on his truck ordered the soldiers to attack. Many soldiers were wounded in the firefight, and Urrea drove four of them to a hospital. He later learned that many soldiers had been captured by the ELN.

On 10 December 2000, while he was filling an army truck at a city gas station, armed men abducted him and ordered him to drive outside the city. After they had driven several miles, more men boarded the truck. Later, the men ordered him to stop and get out of the truck. He heard them talk about using the truck to move people to another camp. However, while they were not looking, he escaped into the jungle. He ran to a shop, called his battalion, and told the battalion the

---

[2] Paola, Helbert, and Raquel are derivative claimants on Urrea's application.

location of the guerillas. The army fought the guerillas and rescued some captives. The ELN declared Urrea a military target because it knew that he was responsible for informing the military of its position. ELN members came to his home on 13 December 2000 and threatened Paola and Patino when they learned he was not at home.

Urrea's asylum application included: (1) a map of Colombia showing the guerilla presence; (2) a United States State Department report on foreign terrorist organizations report that mentioned the ELN as an armed group responsible for assaults, extortion, abductions, and bombings; (3) a 2001 Human Rights Watch article noting that guerilla groups in Colombia were responsible for 14 deaths a day in 2000, up from 12 a day in 1999; and (4) a February 2001 Human Rights Watch article noting that the ELN participated in abductions and killings.

On 23 January 2001, the INS conducted a "credible fear" interview with Urrea. In that interview, Urrea stated:

> In November about the 20th, we were sent to kilometer 18 to take some soldiers and we were stopped by the guerilla and the shooting started. I had soldiers in my truck who were shot and I took them back. Nothing happened to me. Then they were threatening us at our home and were putting pamphlets under our door. They threatened to kill my whole family.

Administrative Record ("AR") at 468, 475. He further stated that he did not have a visa to enter the United States. The report found that Urrea had established credible fear.

Patino also filed an asylum application on 2 October 2001. She stated that she had been threatened by the ELN because of Urrea's actions against them. During Patino's credible fear interview, she stated her family had planned, before leaving Colombia, to remain in the United States despite the fact that they purchased tickets for Spain.

The record included the 2003 State Department Country Report for Colombia. According to the country report, internal armed conflict between the government and the ELN had continued through 2002. The ELN had threatened and attacked human rights activists, and it and the Colombian Revolutionary Armed Forces ("FARC") were responsible for most of the civilian deaths attributable to internal armed conflict. The ELN announced it would work with the FARC and continued its policy of threatening and killing urban officials, journalists, labor union members, religious leaders, and members of the police. The ELN kidnaped civilians to help finance subversion and tortured its victims. The ELN had a standing policy of kidnaping individuals for political reasons as well, and it used hostages to demand political concessions. It also caused massive

displacements and engaged in random terrorist bombings. The record also included the Country Reports for 2000 and 2002, which were similar to the 2003 Country Report, and the 1997 Colombia Profile of Asylum Claims and Country Conditions, which stated that the majority of claims from Colombia are based on political opinion, and most of the claims allege mistreatment by the guerilla groups.

Two Colombian police reports were placed in the record. The first police report was dated 15 December 2000. According to the report, Urrea returned home on 13 December 2000, at 12:30 A.M., and Paola and Patino reported to him that the ELN threatened them and asked for him. The ELN told them to leave the country within eight days. Urrea believed that the ELN threatened him because of his involvement in the firefight. Further, the report noted that he had been taken hostage by the ELN a few days after the firefight and was able to escape and alert the army as to the guerillas' and their captives' whereabouts. The second police report was dated 22 December 2000 and noted that Urrea had previously made a report against the ELN.

The record contained other documents, including: (1) an amendment to Urrea's application noting that he had served in the Colombian army from March 1991 to March 1992, and then worked for the army as a truck driver; (2) a letter

from Lieutenant Colonel Arnulfo Trujillo Ortiz stating that Urrea was a motorist with the Third Brigade; (3) a letter from University Hospital stating that Urrea arrived with two soldiers wounded in combat on 20 November 2000; (4) Urrea's military ID; (5) a report from Donna Eisenberg, a document expert, who noted that Urrea's military ID was probably authentic but that the letter from the military was fabricated and that the letter from the hospital was probably not authentic; and (6) another report from Eisenberg in which she stated that the authenticity of the police reports was suspect.

At Petitioners' removal hearing, they conceded removability for seeking admission to the United States without documentation but did not admit to the fraud allegation. The IJ dismissed the fraud charges against the children.

At the asylum hearing, Donna Eisenberg testified as an expert concerning the authenticity of documents that Urrea submitted. Urrea stipulated to Eisenberg's qualifications as an expert. Eisenberg testified that the government asked her to authenticate five documents. She could not definitively refute the police report but found that it was probably not authentic. Police reports in the forensic document library are typically drafted on paper with a preprinted letterhead. The letterhead is printed using offset lithographic printing. However, the letterhead on Urrea's police report was photocopied and contained marks that

suggested it had been reproduced several times. She had never seen a genuine police report created in the same manner as Urrea's report. She also stated that the second police report was also probably not authentic as its letterhead had been created with a typewriter, not offset lithographic printing.

Eisenberg testified that Urrea's letter from the Colombian military was fabricated. It did not contain a preprinted letterhead but had been printed completely from an inkjet printer. Further, the wet seal and signature had also been printed by the inkjet printer.

On cross-examination, Eisenberg testified that she had reviewed letters from the Colombian military but not the Third Brigade. She stated that it was possible the military could have updated the letterheads, but it was illogical to use photocopied signatures and seals because those parts of the letter were used for authentication. She then testified that she was suspicious of the letter from the hospital because the letterhead had been preprinted with a photocopier, but the body had been added with a typewriter. She admitted that she could not refute or authenticate seals because none were on file. She admitted that Urrea's military ID was probably authentic. On examination by the IJ, Eisenberg testified that if the signature and seal are preprinted, it is possible to lift them from one document and use them on another.

Urrea testified that he was a motorist for the Military Forces of Colombia from 1992 until 2000. He applied for the motorist position after he finished a year of military service. He lived at the base, drove a truck with military markings, and transported soldiers. At his request, his mother obtained a letter from the military attesting to his service, which she sent to him. He testified that his mother did not have a computer.

Urrea admitted that he did not belong to a political party, and he had visited the United States three times prior to his present visit. He came to the United States with his family because he was threatened by the ELN after he informed on the group. He repeated the details of his encounters with the ELN on 20 November and 10 December 2000 but added new information concerning a guerilla camp in the jungle during his 10 December 2000 escape.

With regard to the incident on 13 December 2000, Urrea stated that Paola and Patino told him that ELN members came to their home and threatened them while he was at work. The men wanted to put Urrea on trial. The men came to the home at 8:30 P.M., and Urrea came home an hour later. Urrea testified that they reported the threats to the police and his supervisors at the battalion, but neither said that they could do anything. Urrea testified that they left and went to live with his parents, but he continued working until 25 December 2000.

9

Urrea admitted that he waited two days to report the ELN threats at his home on 13 December 2000. He also did not attempt to relocate outside of Cali. He requested a transfer from his position, but the military did not accommodate him. Urrea testified that he mentioned the 10 December 2000 abduction and the ELN pamphlets during his 23 January 2001 interview. He insisted that the police erred in drafting the report that indicated that he did not return home until 12:30 A.M.

Adding new details, Urrea testified that on 10 December 2000, thirty guerillas took him on a 45 to 50 minute hike to an isolated camp in the jungle, but none fired on him when he fled. Urrea stated that when he called the battalion after his abduction, he told them that he had been taken to kilometer 18. He testified that he was abducted at 1:00 P.M. He dropped off the truck in the jungle at 3:00 P.M. and arrived at the guerillas' camp at around 4:00 P.M. He escaped half an hour later and was able to get to the store to call his battalion by 6:00 P.M.

Patino testified that she lived with her daughter in the United States and has a son in Colombia. She came to the United States with her daughter because the ELN threatened her because she lived with Paola and Urrea. On 13 December 2000, men knocked loudly on her door and said Urrea was a "stool pigeon." AR at 203. Patino and Paola did not answer the door but instead stayed in the living

10

room. Patino knew that they were guerillas because they were aggressive and wore ELN armbands. She testified that Urrea came home at 9:30 P.M. after the incident.

On cross-examination, Patino stated that some of the ELN members who threatened her had come into the house. She also stated that the family remained in the home for a month and ten days, and the ELN slipped pamphlets under the door during that time. On questioning by the IJ, Patino stated that the family was on its way to Spain when it decided to get off the plane in the United States.

The IJ denied Petitioners' applications for asylum, withholding of removal, and CAT relief. The IJ sustained the fraud charge as to Urrea, Paola, and Patino. The IJ cited to numerous inconsistencies in the record, including: (1) that Urrea did not mention his abduction on 10 December 2000 during his 23 January 2001 interview; (2) that Urrea did not mention receiving pamphlets during that interview; (3) that the police report filed on 15 December 2000 did not mention pamphlets; (4) that the asylum application and police report do not mention Urrea's 45-to-50 minute hike through the jungle with his abductors to the guerilla camp; (5) that the police report indicated that Urrea arrived home at 12:30 A.M. after the ELN threatened his family, not 9:30 P.M., as he testified; (6) that the hospital report indicated that he transported two soldiers, not four, as he testified; and (7) that Urrea claimed that the family stayed in their home for only three days

11

after the 13 December 2000, incident, while Patino stated they stayed for a month and a half.

The IJ concluded that Urrea's testimony was not credible. The IJ found inconsistencies between the testimony, application, and corroborating documents. Additionally, the IJ found Urrea's military ID valid but concluded that his letters from the military and hospital were fraudulent. The IJ opined that Urrea should have submitted other documents with more corroborative value. The IJ also found it implausible that Urrea could be led through an unfamiliar jungle without a path for 45 to 50 minutes, then escape and find a phone an hour later, and alert his battalion to the guerillas' location. The IJ found that Urrea did not establish a nexus between the threats and a protected ground as he was not politically active, but was threatened because he was a witness reporting criminal activity. Further, the IJ found that the conduct did not constitute persecution, that Urrea and his family failed to try to relocate within Colombia, and that Urrea did not establish that the threat was country-wide.

Petitioners filed a notice of appeal with the BIA. In a separately filed brief, Urrea argued that the ELN imputed the military's opinion to him. He stated that he had a well-founded fear of persecution because the ELN has the capability and inclination to punish him for his actions against them. He also asserted that the IJ

erred in relying on the forensic examiner's opinion concerning his documentary

evidence. The BIA affirmed the IJ's decision without opinion.

## II. DISCUSSION

There are three main issues on appeal:[3] (1) whether substantial evidence

supports the IJ's conclusion that Petitioners' corroborative documents were not

reliable; (2) whether substantial evidence supports the IJ's adverse credibility

determination; (3) whether substantial evidence supports the IJ and BIA's

conclusion that Petitioners failed to establish a nexus between their alleged

persecution and an enumerated ground to support a claim for asylum and, relatedly,

that Petitioners failed to establish a well-founded fear of persecution. After

confirming our standard of review, we address these issues in turn.

A. Standard of Review

When the BIA issues a decision, we review only that decision, "except to the

extent that [the BIA] expressly adopts the IJ's decision." Al Najjar v. Ashcroft,

257 F.3d 1262, 1284 (11th Cir. 2001). Here, because the BIA expressly adopted

the IJ's decision, we review the IJ's decision. To the extent that the IJ's decision

was based on a legal determination, our review is de novo. Mohammed v.

---

[3]Petitioners did not raise any arguments concerning the denial of their claims for withholding of removal under the INA or CAT relief. Accordingly, these issues have been abandoned. See Sepulveda v. U.S. Att'y Gen., 401 F.3d 1226, 1228 n.2 (11th Cir. 2005) (per curiam).

<u>Ashcroft</u>, 261 F.3d 1244, 1247 (11th Cir. 2001). Factual determinations are reviewed under the substantial-evidence test, and we "must affirm the . . . decision if it is 'supported by reasonable, substantial, and probative evidence on the record considered as a whole.'" <u>Al Najjar</u>, 257 F.3d at 1283-84. The substantial evidence test is "deferential" and does not allow "re-weigh[ing] the evidence from scratch." <u>Mazariegos v. U.S. Att'y Gen.</u>, 241 F.3d 1320, 1323 (11th Cir. 2001) (quotations omitted). "To reverse the IJ's fact findings, we must find that the record not only supports reversal, but compels it." <u>Mendoza v. U.S. Att'y Gen.</u>, 327 F.3d 1283, 1287 (11th Cir. 2003) (considering withholding-of-removal claim). The fact that evidence in the record may also support a conclusion contrary to the administrative findings is not enough to justify a reversal. <u>Adefemi v. Ashcroft</u>, 386 F.3d 1022, 1027 (11th Cir. 2004) (en banc), <u>cert. denied</u>, 544 U.S. 1035, 125 S. Ct. 2245 (2005).

B. <u>Reliability of Documents</u>

Petitioners argue that the testimony of the government's document expert, Donna Eisenberg, was not sufficient for the IJ to find that some documents that they submitted in support of their claim were unreliable. In <u>Pasha v. Gonzales</u>, the Seventh Circuit held that an IJ should not have accepted the testimony of a document expert who examined an Albanian document when the expert did not

14

speak Albanian, did not have access to comparable documents, and was "confessedly ignorant" of the Albanian government's resources. 433 F.3d 530, 532, 535 (7th Cir. 2005). The Seventh Circuit held that the "spirit" of the rule concerning the admission of scientific evidence announced in Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579, 113 S. Ct. 2786 (1993), applied to immigration proceedings. Pasha, 433 F.3d at 535. No other circuit has considered Daubert's effect on immigration cases.

We need not decide whether to adopt the rationale in Pasha because Urrea stipulated that Eisenberg was qualified to testify as an expert. Moreover, though Eisenberg admitted that she did not have documents from Urrea's specific battalion, she was familiar with documents from the Colombian military and had exemplars from the military to which to compare Urrea's documents.

Further, Eisenberg did not base her conclusion on aspects of the Spanish language, but instead on the manner in which the documents were produced. She testified that letterheads were typically preprinted using an offset lithographic process, but Urrea's documents had photocopied or typewritten letterheads. For example, in one case, the letterhead appeared to have been reproduced several times. In addition, she opined that the seal and signature on the military letter had been copied as well, and that it was illogical that such security features would be

15

photocopied. Thus, substantial evidence supports the IJ's conclusion that Urrea's corroborating documents were unreliable, and Urrea has put forth no evidence that compels reversal.

C. Adverse Credibility Determination

An alien's testimony, if credible, may be sufficient to sustain the burden of proof for asylum or withholding of removal without corroboration. 8 C.F.R. §§ 208.13(a), 208.16(b). "Conversely, an adverse credibility determination alone may be sufficient to support the denial of an asylum application." Forgue v. U.S. Att'y Gen., 401 F.3d 1282, 1287 (11th Cir. 2005). "[T]he IJ must offer specific, cogent reasons for the adverse credibility findings." Id. "The weaker the applicant's testimony, however, the greater the need for corroborative evidence." Yang v. U.S. Att'y Gen., 418 F.3d 1198, 1201 (11th Cir. 2005). We may not reverse an IJ's determination that corroborative evidence was available unless we find we are compelled to do so. 8 U.S.C. § 1252(b)(4). When an IJ enumerates an applicant's inconsistencies, as supported by the record, we "will not substitute our judgment for that of the IJ with respect to its credibility findings." D-Muhumed v. U.S. Att'y Gen., 388 F.3d 814, 819 (11th Cir. 2004). Further, an adverse credibility determination does not alleviate the IJ's duty to consider all of an applicant's evidence. Forgue, 401 F.3d at 1287.

16

We conclude that substantial evidence supports the IJ's adverse credibility finding. As an initial matter, the IJ found Urrea's testimony inconsistent as to whether he had been abducted. The finding is supported by substantial evidence because Urrea's testimony concerning the abduction changed in significant detail each time he told the story. The IJ also found Urrea's testimony inconsistent regarding whether he received pamphlets after the ELN's 13 December 2000 threat. Urrea stated that he received pamphlets from the ELN after the threat during his credible fear interview, but he did not mention the pamphlets in his application, or during his direct testimony at the asylum hearing. Patino also did not mention the pamphlets until she was cross-examined.

The IJ also found the evidence concerning the shooting to be inconsistent because Urrea's statements and testimony contradicted documentary evidence that he submitted concerning how many soldiers he drove to the hospital after the start of the firefight. The inconsistencies concern Urrea's contact and mistreatment by the ELN on account of his political opinion, so they are specific and cogent reasons for the adverse credibility finding. However, as the IJ did not consider the adverse credibility decision to be dispositive, the analysis continues.

D. Eligibility for Asylum

17

An alien who arrives in or is present in the United States may apply for asylum. 8 U.S.C. § 1158(a)(1). The Attorney General or the Secretary of DHS has discretion to grant asylum if the alien meets the INA's definition of a "refugee." Id. § 1158(b)(1). A "refugee" is defined in the INA as

> any person who is outside any country of such person's nationality . . . and who is unable or unwilling to return to, and is unable or unwilling to avail himself or herself of the protection of, that country because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion.

Id. § 1101(a)(42)(A). The asylum applicant carries the burden of proving statutory "refugee" status. Al Najjar, 257 F.3d at 1284.

To establish asylum eligibility, the alien must, with specific and credible evidence, establish (1) past persecution on account of a statutorily listed factor, or (2) a "well-founded fear" that the statutorily listed factor will cause such future persecution. 8 C.F.R. § 208.13(a), (b); see Al Najjar, 257 F.3d at 1287. "Demonstrating such a connection requires the alien to present specific, detailed facts showing a good reason to fear that he or she will be singled out for persecution on account of [a statutory factor]." Al Najjar, 257 F.3d at 1287 (quotations omitted). It is not enough for an asylum applicant to show that he or his alleged persecutors have a political opinion; he must show that he was

18

persecuted "on account of" that opinion. See INS v. Elias-Zacarias, 502 U.S. 478, 482, 112 S. Ct. 812, 816 (1992).

While the INA does not define persecution, we have held that it is "an extreme concept, requiring more than a few isolated incidents of verbal harassment or intimidation, and that mere harassment does not amount to persecution." Zheng v. U.S. Att'y Gen., 451 F.3d 1287, 1290 (11th Cir. 2006) (per curiam) (quotations omitted). We have held that: (1) receiving a "condolence note," expressing sympathy for the petitioner's death, even if linked to a protected ground, constituted harassment, and not persecution; and (2) receiving anonymous threats over the telephone, without more, also did not qualify as persecution. Silva v. U.S. Att'y Gen., 448 F.3d 1229, 1237-38 (11th Cir. 2006). However, we declined to decide whether an incident during which the petitioner's car was shot at constituted persecution because the record did not compel the conclusion that there was a nexus between the shooting and the protected ground. Id. at 1238-39. We concluded that "only in a rare case does the record compel the conclusion that an applicant for asylum suffered past persecution." Id. at 1239.

If the alien establishes past persecution, it is presumed that his life or freedom would be threatened upon a return to that country unless the government shows by a preponderance that the country's conditions have changed such that the

19

applicant's life or freedom would no longer be threatened upon his removal or that the alien could relocate within the country and it would be reasonable to expect him to do so. 8 C.F.R. § 208.13(b)(1). An alien who has not shown past persecution may still be entitled to asylum or withholding of removal if he can demonstrate a future threat in his country to his life or freedom on a protected ground. Id. § 208.13(b)(2). To establish a well-founded fear, "an applicant must demonstrate that his or her fear of persecution is subjectively genuine and objectively reasonable." Al Najjar, 257 F.3d at 1289. An imputed political opinion may support a well-founded fear claim. Id. However, if the IJ finds that the alien could avoid a future threat by relocating to another part of his country and it would be reasonable to require the alien to do so, he cannot demonstrate a well-founded fear of persecution. See 8 C.F.R. § 208.13(b)(1)-(2).

Substantial evidence supports the IJ's decision that Urrea and Patino did not suffer past persecution on account of a protected ground. As such, the derivative claims of Urrea's family also fail. Substantial evidence supports the IJ's findings that Urrea's testimony was not credible and that the letter from the Colombian army, the letter from the hospital, and the police report concerning the ELN threats at his home were not reliable. Thus, Urrea has not introduced any credible evidence showing that he was involved in a shooting with the ELN, was later

20

abducted by the ELN, or was then threatened by the ELN. Accordingly, Urrea and Patino have not shown that evidence exists that would compel a finding that they had been persecuted on account of a protected ground. As they have not established past persecution, they are not entitled to a presumption of a well-founded fear of future persecution. As stated above, the evidence is insufficient to compel a finding that Urrea was abducted and threatened on account of his political opinion. Thus, that evidence does not compel a conclusion that he has a well-founded fear of persecution in Colombia. Accordingly, Petitioners have not established a reasonable probability of future persecution on account of a protected ground and thus a well-founded fear of future persecution.

## III. CONCLUSION

We conclude that substantial evidence supports the IJ's conclusions regarding the corroborative documents and the adverse credibility determination. Moreover, we conclude that substantial evidence supports the IJ and BIA's conclusion that Petitioners failed to establish their eligibility for asylum.

**PETITION DENIED.**