[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
FEB 13, 2007
THOMAS K. KAHN
CLERK

No. 06-13318
Non-Argument Calendar
_____

Agency Nos. A79-340-323
A79-340-325

VICTOR MANUEL URIBE,
MARTHA CECILIA ARANGO,

Petitioners,

versus

U.S. ATTORNEY GENERAL,

Respondent.

_____

Petition for Review of a Decision of the
Board of Immigration Appeals
_____

**(February 13, 2007)**

Before BLACK, MARCUS and WILSON, Circuit Judges.

PER CURIAM:

Victor Manuel Uribe, his spouse, Martha Cecilia Arango, and his two

children petition this Court for review of the Board of Immigration Appeals' ("BIA's") order affirming, without opinion, the immigration judge's ("IJ's") final order of removal and denial of their applications for asylum, withholding of removal, and relief under the United Nations Convention Against Torture ("CAT"). On appeal, lead petitioner, Victor Manuel Uribe ("Uribe") argues that the BIA erred in upholding the IJ's adverse credibility finding because he provided substantial evidence to support his asylum and withholding of removal claims. After review, we deny the petition.

## BACKGROUND

Uribe and his daughter, Luisa Fernanda Uribe, natives and citizens of Colombia, were admitted to the United States, on or about August 9, 2000, as nonimmigrant visitors with authorization to remain in the United States until February 8, 2001. Uribe's spouse, Martha Cecilia Arango, and his son, Victor Manuel Uribe, also citizens and natives of Colombia, entered the United States on or about December 4, 2000, as nonimmigrant visitors with authorization to remain in the United States until May 3, 2001.

Uribe filed an application for asylum and withholding of removal with the Immigration and Naturalization Service ("INS")[1] on behalf of himself, his wife,

---

[1] On November 25, 2002, President Bush signed into law the Homeland Security Act of 2002, Pub. L. No. 107-296, 116 Stat. 2135. The act created a new Department of Homeland Security, abolished the INS, and transferred its functions to the new department. However,

2

and his two children. In the application, Uribe indicated that he was seeking asylum or withholding of removal due to persecution based on his political opinion. Specifically, he stated that he had suffered persecution at the hands of the Revolutionary Armed Forces of Colombia ("FARC") guerillas, and he said that he would be physically harmed by FARC if he returned to Colombia. Uribe claimed that as early as 1993, FARC began demanding that he attend meetings that they were holding in the Uraba area of Northwest Colombia, about two hundred miles from the city of Medellin. Uribe owned a cattle business in the Uraba area. After he refused to attend, FARC guerillas began sending him threatening notes and demanding that he pay FARC a monthly "war tax." Uribe claimed that FARC kidnaped him in 1993, but he later escaped and left his property in the control of others.

In early 1995, FARC tried to recruit his son. In June 1995, Uribe learned that FARC guerillas were using an abandoned house on one of his farms to hold meetings. In order to "prevent the complete take over of the area by the guerillas," he instructed his farmhand to burn the house down, but he learned that the farmhand was cooperating with the guerillas. The farmhand only burned the house down after Uribe made a second request. Uribe claimed that the guerillas then

---

because this case was initiated while the INS was still in existence, we refer to the agency as the INS.

came to his house and held him prisoner, and he overheard them saying that they were going to kill him because he opposed them. Uribe claimed that he was spared when the guerillas received a radio message and had to quickly leave the area.

In 1997, Uribe took a job managing a school cafeteria, and he told the students they needed to participate in elections and not fall into the hands of the guerillas. Two boys from the Milicias Boliviaranas, an urban organization of FARC, told him he needed to stop talking to the boys at the school or they would make sure he did not talk to anyone again. In June 1999, the school's director told Uribe that he needed to leave or he would be killed by guerillas. He left the position, and in April 2000, he was told that the guerillas had left the area around his farm. He sent his employee to administer his land, but his employee was killed. Uribe left for the United States in August 2000.

On April 24, 2001, the INS issued two separate Notices to Appear ("NTA"), charging that Uribe and his daughter, Luisa Fernanda Uribe, were subject to removal under INA §§ 237(a)(1)(B) and 101(a)(15). On September 11, 2003, the INS issued two NTAs against Uribe's wife and son. The family members' cases were later consolidated with Uribe's.

At the removal hearing before an IJ, Uribe submitted a group of exhibits, including: documents that indicate that Uribe and his family were members of the Liberal Party; a query response from the INS Resource Information Center that

4

discussed how political developments and trends affected specifically targeted and vulnerable groups in Colombia; a query response from the INS Resource Information Center that discussed the prospects for relocation in Colombia for those who opposed FARC; a report by the United States Department of State discussing FARC's impact throughout Colombia; and a letter from the rector at the school where Uribe worked stating that Uribe had to leave the country due to threats from insurgent groups. Uribe also submitted a police report that he had filed with the city of Medellin in August 1995. He filed the report because someone had stolen from his property some livestock and farm equipment. Uribe reported that he had received a call from his farmhand who informed him that twenty-six armed men had stolen many animals and clothes from his farm. Uribe also reported that the farmhand had been taken hostage, and the that farmhand told Uribe not to go back to the farm or he would be killed.

At an initial asylum hearing, Uribe and his family, through counsel, admitted all of the allegations in the NTAs and conceded removability, and they declined to designate a country of removal. At the final asylum hearing, Uribe and his eldest daughter [2] testified about the events contained in Uribe's asylum application. The IJ denied Uribe's and his family's applications for asylum, withholding of removal, and CAT relief, and ordered them removed to Colombia. The IJ found that Uribe

---

[2] Uribe's oldest daughter, Elizabette Cristina Uribe, was not included in the application.

had failed to present credible evidence in support of his application. The IJ had problems with Uribe's credibility for many reasons. For example, the IJ noted Uribe's allegation that FARC held him prisoner and threatened to kill him in June 1995 was not mentioned in the police report that he had filed only two months after the incident. In the police report, Uribe did not state that he had any personal problems with FARC. The IJ did not find credible Uribe's explanation that he did not include his allegations against FARC in the police report because the police never did anything. The IJ also found that Uribe did not offer a credible explanation and was evasive in answering why he did not apply for asylum in 1996 when he was in the United States if FARC had committed these egregious acts against him in 1995.

In the alternative to his adverse credibility determination, the IJ found that Uribe failed to show a nexus between any threat or harm and any of the five protected grounds. The IJ noted that criminal extortion and attempted recruitment do not constitute persecution. Consequently, the IJ found that Uribe failed to show past persecution or a well-founded fear of future persecution. Uribe filed a notice of appeal and the BIA affirmed the IJ's decision without opinion. Uribe filed this petition.

## STANDARD OF REVIEW

In this case, the BIA expressly adopted and affirmed the IJ's decision

without issuing its own decision. When the BIA issues a summary affirmance of the IJ's opinion, we review the IJ's opinion as if it were the BIA's. *See Al Najjar v. Ashcroft*, 257 F.3d 1262, 1284 (11th Cir. 2001). We review legal determinations of the IJ *de novo*. *Mohammed v. Ashcroft*, 261 F.3d 1244, 1247 (11th Cir. 2001). We review any factual determinations under the "substantial evidence test." *Al Najjar*, 257 F.3d at 1283. We look to see if the IJ's factual determinations are "supported by reasonable, substantial, and probative evidence on the record considered as a whole." *Id.* at 1284 (internal quotations marks omitted). "To reverse the IJ's fact findings, we must find that the record not only supports reversal, but compels it." *Mendoza v. U.S. Att'y Gen.*, 327 F.3d 1283, 1287 (11th Cir. 2003). A determination that an alien is ineligible for asylum or withholding is a factual determination. *See Al Najjar*, 257 F.3d at 1283.

## DISCUSSION

Uribe raises three issues in his brief: (1) whether the BIA erred in upholding the IJ's adverse credibility determination; (2) whether the BIA erred in denying Uribe's application for asylum because Uribe provided substantial testimony and documentary evidence that he suffered past persecution and had a well-founded fear of persecution on account of his political opinion and membership; and (3) whether the BIA erred in finding that Uribe failed to show that it is "more likely

7

than not" that he will be persecuted upon his return to Colombia.[3]

1.    Credibility Determination

We review a credibility determination, which is a finding of fact, using the substantial evidence test. *Ruiz v. U.S. Att'y Gen.*, 440 F.3d 1247, 1255 (11th Cir. 2006) (per curiam). Under this test, we review the record evidence in the light most favorable to the agency's decision and draw all reasonable inferences in favor of that decision. *Id*. We "cannot engage in fact-finding on appeal, nor may we weigh evidence that was not previously considered below." *Al Najjar*, 257 F.3d at 1278. Therefore, a finding of fact will be reversed "only when the record compels reversal; the mere fact that the record may support a contrary conclusion is not enough to justify a reversal of the administrative findings." *Silva v. U.S. Att'y Gen*, 448 F.3d 1229, 1236 (11th Cir. 2006).

The IJ must make an explicit credibility determination. *Yang v. U.S. Att'y Gen.*, 418 F.3d 1198, 1201 (11th Cir. 2005). "[A]n adverse credibility determination alone may be sufficient to support the denial of an asylum application" when there is no other evidence of persecution. *Forgue v. U.S. Att'y Gen.*, 401 F.3d 1282, 1287 (11th Cir. 2005). However, "[i]f any applicant

_____

[3] Uribe also claims that the BIA erred in upholding the IJ's denial of relief under CAT. However, Uribe did not exhaust his claim for CAT relief, because he did not raise it in his appeal to the BIA. Accordingly, we lack jurisdiction to consider this claim. *See Sundar v. INA*, 328 F.3d 1320, 1323 (11thCir. 2003) (concluding that the exhaustion requirement at 8 U.S.C. § 1252(d)(1) is jurisdictional, barring claims that have not been raised before the BIA).

produces evidence beyond his own testimony, it is not sufficient for the IJ to rely solely on an adverse credibility determination in those instances." *See Ruiz*, 440 F.3d at 1255 (internal quotation marks omitted). "Once an adverse credibility finding is made, the burden is on the applicant alien to show that the IJ's credibility decision was not supported by 'specific, cogent reasons' or was not based on substantial evidence." *Forgue*, 401 F.3d at 1287.

In this case, the IJ made an explicit finding of adverse credibility and gave "specific, cogent reasons" for this finding. The IJ stated that, although Uribe testified that he was held prisoner by FARC in 1995, he did not mention this event in the police report he filed soon thereafter. Instead, Uribe only mentioned the fact that cattle and other items had been stolen and that his foreman had been detained. Uribe explained to the IJ that he did not report this incident because the police do not do anything; however, the IJ found this to be an unsatisfactory explanation. The IJ noted that if the police really did not do anything, then it did not make any sense that Uribe would have filed a police report at all. The IJ also noted that Uribe seemed evasive when asked about a trip he made to the United States in July 1996, and only admitted having taken the trip after he was told it was information he had included on his asylum application. The IJ found it implausible that he would not have requested asylum during this trip in 1996 if he had actually been held prisoner and threatened to be killed by FARC in 1995. Furthermore, the IJ

9

found it implausible that Uribe's farmhand would have informed him that FARC was using one of his farmhouses for its meetings if the farmhand was in fact "in cahoots" with FARC.

On appeal, Uribe argues that a plausible explanation for why he omitted the incident with FARC from the police report was that he only filed the police report for insurance purposes; however, Uribe did not offer this explanation during the hearing. Uribe also claims that he did not file for asylum when he came to the United States in 1996, because he thought that he would be safe in the city of Medellin. However, even if some of Uribe's testimony and explanations addressing the IJ's concerns present plausible reasons for his actions, a review of the record certainly does not compel a reversal. *See Silva*, 488 F.3d at 1236.

As discussed above, the IJ still had to look at other evidence Uribe submitted to support his application. *Forgue*, 401 F.3d at 1287. In his brief, Uribe discusses the documentary evidence contained in the query responses from the INS Resource Information Center and a report by the United States Department of State that conclude that FARC has a country-wide influence in Colombia. However, there is no evidence that the IJ failed to consider these documents in considering Uribe's application, since the IJ discussed FARC as a guerilla organization in his written opinion. Furthermore, the record clearly indicates that the IJ considered the police report filed by Uribe and the testimony of Uribe's daughter. Therefore, in light of

the record, Uribe has not met his burden that the adverse credibility determination was unsupported by specific and cogent reasons or was not based on substantial evidence.

2.    Past Persecution & Reasonable Fear of Future Persecution

Even if Uribe was found to be credible, the IJ held that Uribe failed to establish a nexus between any threat or harm based on one of the enumerated statutory grounds.  The Secretary of Homeland Security or the Attorney General has discretion to grant asylum if an alien meets the INA's definition of a "refugee." INA § 208(b)(1), 8 U.S.C. § 1158(b)(1).  A "refugee" is:

> any person who is outside any country of such person's nationality . . . and who is unable or unwilling to return to, and is unable or unwilling to avail himself or herself of the protection of, that country because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion . . . .

INA § 101(a)(42)(A), 8 U.S.C. § 1101(a)(42)(A).  To establish asylum eligibility, the alien must, with specific and credible evidence, establish (1) past persecution on account of a statutorily listed factor, or (2) a "well-founded fear" that the statutorily listed factor will cause such future persecution.  8 C.F.R. § 208.13(a), (b).  "Demonstrating such a connection requires the alien to present specific, detailed facts showing a good reason to fear that he or she will be *singled out* for persecution on account of" a statutory factor.  *Al Najjar*, 257 F.3d at 1287 (internal

11

quotations marks omitted). An asylum applicant may not show merely that he has a political opinion, but must show that he was persecuted because of that opinion. *I.N.S. v. Elias-Zacarias*, 502 U.S. 478, 483, 112 S. Ct. 812, 816, 117 L. Ed. 2d 38 (1992). Additionally, we have stated that persecution is an "extreme concept, requiring more than a few isolated incidents of verbal harassment or intimidation, and that mere harassment does not amount to persecution." *Sepulveda v. U.S. Att'y Gen.*, 401 F.3d 1226, 1231 (11th Cir. 2005) (per curiam) (internal quotation marks omitted).

An alien who has not shown past persecution still may be entitled to asylum if he can demonstrate a future threat to his life or freedom on a protected ground. 8 C.F.R. § 208.13(b). To establish a "well-founded fear," an applicant must show that he has a fear of persecution in his home country and that "[t]here is a reasonable possibility of suffering such persecution if he or she were to return to that country." 8 C.F.R. § 208.13(b)(2)(i).

In this case, substantial evidence supports the IJ's findings that Uribe did not show past persecution or a well-founded fear of future persecution, and thus, he was not eligible for asylum. Although Uribe testified that FARC demanded he pay war taxes and attempted to recruit him and his son, these demands simply do not rise to the level of persecution. *Sepulveda*, 401 F.3d at 1231-32.

Uribe testified that the guerillas held him prisoner and had threatened to kill

him because he did not want to cooperate with them. However, we have held that being persecuted for failing to cooperate with guerillas does not constitute persecution on account of a political opinion. *See Sanchez v. U.S. Att'y Gen.*, 392 F.3d 434, 438 (11th Cir. 2004) (per curiam). In sum, the record does not compel a conclusion that the events described by Uribe were on account of his political opinion.

Since Uribe failed to establish past persecution, he is not entitled to a presumption of a well-founded fear of future persecution. Because we conclude that Uribe had not satisfied the less stringent standard for asylum, he is not entitled to withholding of removal. *Forgue*, 401 F.3d at 1288 n.4.

Accordingly, we deny Uribe's petition.

**PETITION DENIED**.