[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
April 6, 2007
THOMAS K. KAHN
CLERK

_____

No. 06-14643
Non-Argument Calendar

_____

BIA No. A79-102-095

TITO EILIAS ROJAS AZCARATE,

Petitioner,

versus

U.S. ATTORNEY GENERAL,

Respondent.

_____

Petition for Review of a Decision of the
Board of Immigration Appeals

_____

**(April 6, 2007)**

Before HULL, WILSON and PRYOR, Circuit Judges.

PER CURIAM:

Tito Eilias Rojas Azcarate ("Azcarate") petitions for review of the final

order of the Board of Immigration Appeals ("BIA"), which adopted and affirmed the removal order of the Immigration Judge ("IJ") denying him asylum, withholding of removal under the Immigration and Nationality Act ("INA"), and relief under the United Nations Convention Against Torture ("CAT"). After review, we deny the petition.

## I.  BACKGROUND

Azcarate, a native and citizen of Colombia, arrived in Miami, Florida on March 29, 2001, without a visa or other type of entry permit. When Azcarate was detained and interviewed by immigration officials at the Miami airport, he stated his intention to apply for political asylum in the United States.

Azcarate was then served with a Notice to Appear, alleging, inter alia, that he was an arriving alien without a valid unexpired visa or other valid entry document, in violation of 8 U.S.C. § 1182(a)(7)(A)(i)(I). At the April 4, 2002, hearing before the IJ, Azcarate conceded removability on the basis of being an arriving alien without a valid unexpired visa or other valid entry document. Azcarate also filed his asylum application.

According to his asylum application, Azcarate fears for his life because the United Civil Defense Patrols of Colombia ("AUC") believes him to be a guerrilla sympathizer. Azcarate's asylum application states that: (1) he began receiving threatening telephone calls from the AUC in early March 2001; (2) he received six

2

to eight such calls; (3) he received a threatening "condolence" note on March 22, 2001; (4) he fled the country in response to the condolence note and the phone calls; and (5) the threats were related to the AUC's murder of his cousin, with whom he ran a business in Carmelo, Colombia. In Azcarate's view, the AUC will torture and kill him if he returns to Colombia.

Azcarate attached to his asylum application an AUC "death list" containing his name; an AUC flyer warning that individuals collaborating with the guerrillas would be considered military targets; a complaint he filed with the Office of Public Prosecutor on March 27, 2001, regarding the death threats; a translated copy of the condolence note; and a sworn statement from his deceased cousin's wife stating that AUC paramilitaries killed her husband and that Azcarate had to flee Colombia in response to the death threats.

The merits hearing on Azcarate's asylum application was held on March 31, 2005. Azcarate essentially testified consistently with his written application and explained, through counsel, that he was seeking asylum on the basis of imputed political opinion (specifically, the AUC's belief that Azcarate was helping guerrillas).

Azcarate further testified that on November 22, 2000, the AUC killed his cousin because the AUC believed that Azcarate and his cousin were supplying guerrillas through their store. Azcarate was out of town in Cali, Colombia on

3

November 22, buying supplies for the store. After his cousin's death, the store closed, and Azcarate never returned to Carmelo.

Azcarate admitted that he and his cousin were never actually involved with guerrillas, despite the fact that the AUC thought they were supplying guerrillas through the store. Azcarate received between six to nine threatening phone calls; his wife received four or five such calls. The threatening phone calls were made to Azcarate's residence in Cali. Azcarate notified the authorities of the death threats five days after receiving the condolence note on March 22, 2001. The authorities recommended he leave the country. Azcarate did not relocate within Colombia because the AUC was well-organized and would find him.

However, Azcarate admitted that: (1) his wife and two daughters still reside in Cali and have had no problems with the AUC; (2) he was never physically accosted or attacked during the three months he spent in Colombia after his cousin's death; and (3) he was not involved in politics in any way in Colombia, other than voting. This testimony was consistent with Azcarate's asylum application, which states that neither Azcarate nor any member of his family belonged to or had been associated with any organization such as a political party, military or paramilitary group, student group, or labor union.

The IJ denied Azcarate's request for asylum, withholding of removal, and CAT relief, concluding that the evidence did not support Azcarate's claim that he

had suffered past persecution or had a well-founded fear of future persecution. The IJ noted that: (1) Azcarate testified that he was never involved with Colombian politics, other than voting; (2) the death of Azcarate's cousin did not appear to have been directed at anyone in particular; (3) Azcarate was not present for the incident that resulted in his cousin's death; (4) Azcarate was not actually involved with the guerrillas; (5) in any event, the AUC achieved their objective of preventing Azcarate from helping the guerrillas, because Azcarate's business closed; (6) Azcarate's wife and children still lived in Cali, and had not experienced any threats or problems; and (7) and there was no evidence that the AUC was still looking for Azcarate. Thus, the IJ ordered Azcarate be removed and deported to Colombia.

Azcarate appealed the IJ's decision to the BIA, which adopted and affirmed the IJ's decision. The BIA found that Azcarate's "arguments on appeal regarding credibility fail[ed] to establish" that the IJ erred in concluding that Azcarate had not met his burden of establishing past persecution or a well-founded fear of future persecution. Azcarate timely petitioned this Court for review.[1]

---

[1] When the BIA issues a decision, we review only that decision, "except to the extent that it expressly adopts the IJ's opinion." Al Najjar v. Ashcroft, 257 F.3d 1262, 1284 (11th Cir. 2001). "Insofar as the [BIA] adopts the IJ's reasoning, we will review the IJ's decision as well." Id. Here, the BIA essentially adopted and affirmed the IJ's decision. Although the BIA also determined that Azcarate's "arguments on appeal regarding credibility fail[ed] to establish error," the IJ did not actually make an adverse credibility finding in this case, and in any event, Azcarate does not raise any credibility arguments in his petition for review before this Court. Accordingly, we review the IJ's decision.

## II. DISCUSSION

An alien who arrives in or is present in the United States may apply for asylum. See 8 U.S.C. § 1158(a)(1). The Attorney General has discretion to grant asylum if the alien meets the INA's definition of a "refugee." See 8 U.S.C. § 1158(b)(1). A "refugee" is

> any person who is outside any country of such person's nationality . . . and who is unable or unwilling to return to, and is unable or unwilling to avail himself or herself of the protection of, that country because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion . . . .

8 U.S.C. § 1101(a)(42)(A). The asylum applicant has the burden of establishing statutory "refugee" status. See Al Najjar v. Ashcroft, 257 F.3d 1262, 1284 (11th Cir. 2001).

To carry this burden, the alien must, with specific and credible evidence, establish either (1) past persecution on account of a statutorily listed factor, or (2) a "well-founded fear" that the statutorily listed factor will cause future persecution. Id. at 1287. In order to be well-founded, a fear of persecution must be both "subjectively genuine and objectively reasonable." Id. at 1289. A finding of past

_____

To the extent that the IJ's decision was based on a legal determination, our review is de novo. D-Muhumed v. U.S. Att'y Gen., 388 F.3d 814, 817 (11th Cir. 2004); Mohammed v. Ashcroft, 261 F.3d 1244, 1247 (11th Cir. 2001). Factual determinations are reviewed under the substantial evidence test, and we "must affirm the [IJ's] decision if it is 'supported by reasonable, substantial, and probative evidence on the record considered as a whole.'" Al Najjar, 257 F.3d at 1283-84 (citation omitted).

6

persecution creates a presumption that the alien has a well-founded fear of persecution and shifts the burden to the government to demonstrate either that conditions have changed in the alien's home country or that the alien could avoid such persecution by relocating in the home country and relocation is reasonable. 8 C.F.R. § 208.13(b); § 208.16(b).

This Court has held that "persecution" is an "extreme concept, requiring more than a few isolated incidents of verbal harassment or intimidation, and that mere harassment does not amount to persecution." Sepulveda v. U.S. Att'y Gen., 401 F.3d 1226, 1231 (11th Cir. 2005) (quotation marks, citation, and alteration omitted). "Not all exceptional treatment is persecution." Gonzalez v. Reno, 212 F.3d 1338, 1355 (11th Cir. 2000).

Based on the record as a whole, we conclude that the IJ's denial of Azcarate's asylum application is supported by substantial evidence. See Al Najjar, 257 F.3d at 1283-84. First, Azcarate's treatment at the hands of the AUC did not amount to persecution. According to Azcarate, he received between six and nine threatening telephone calls from the AUC; he received a condolence note; and his cousin was killed. However, Azcarate himself suffered no physical harm or deprivation of liberty, and under our precedent, the threatening telephone calls and condolence note do not amount to persecution. See Silva v. U.S. Att'y Gen., 448 F.3d 1229, 1237-38 (11th Cir. 2006) (condolence note followed by threatening

7

telephone calls did not qualify as persecution); see also Sepulveda, 401 F.3d at 1231 (three threatening telephone calls and in-person threat to petitioner's brother did not compel a finding of persecution).

Second, and in any event, the record does not compel the conclusion that either Azcarate's cousin's death or the threats to Azcarate himself occurred on account of any political opinion imputed to Azcarate (or his cousin) by the AUC.[2] See 8 U.S.C. § 1101(a)(42)(A). Azcarate admitted that, aside from voting, he was not involved in Colombian politics. Azcarate further admitted that neither he nor any members of his family are or ever have been involved or associated with any political party, military or paramilitary group, student group, or labor union. Thus, the evidence does not compel the conclusion that the AUC's threats and attacks were aimed at Azcarate on the basis of his actual or imputed political opinion or activity. Instead, it appears just as plausible from this record that the attacks were designed to shut down businesses that the AUC thought were supplying guerrillas, a goal that the AUC actually achieved (at least in the case of Azcarate).

Finally, Azcarate admitted that his wife and children still live in Cali, at a

_____

[2]In passing, Azcarate's brief asserts that he was persecuted not only on account of his political opinion, but also on account of his membership in a particular social group. See 8 U.S.C. § 1101(a)(42)(A). However, Azcarate did not assert before the IJ that he was persecuted on account of his membership in a particular social group, and accordingly that claim is not properly before this Court because it has not been administratively exhausted. See 8 U.S.C. § 1252(d)(1). Moreover, Azcarate's brief does not specify the social group to which the AUC mistakenly thought he belonged, stating only that the AUC mistakenly thought that he had "undertaken to collaborate with the guerrillas and others."

8

different address, and they have remained there without any problems. We have previously stated that when the alleged persecutors are not affiliated with the government, "'it is not unreasonable to require a refugee who has an internal resettlement alternative in his own country to pursue that option before seeking permanent resettlement in the United States, or at least to establish that such an option is unavailable.'" Sepulveda, 401 F.3d at 1231 (citation omitted). Thus, even if Azcarate had managed to establish past persecution or a well-founded fear of future persecution based on his imputed political opinion or membership in a social group, Azcarate nevertheless failed to establish that relocation within Colombia is an option unavailable to him. See Ruiz v. U.S. Att'y Gen., 440 F.3d 1247, 1259 (11th Cir. 2006) (concluding that petitioner's claim that he could not relocate internally to avoid future persecution was contradicted by his own testimony that his son and his parents have remained unharmed in the region of Colombia where he allegedly was threatened).

For all of these reasons, we conclude that Azcarate has failed to carry his burden of proof on his asylum claim. Moreover, because Azcarate has failed to carry the burden of proof on his asylum claim, his claims for withholding of removal and CAT relief also fail. See Forgue v. U.S. Att'y Gen., 401 F.3d 1282, 1288 n.4 (11th Cir. 2005) ("Because [petitioner] has failed to establish a claim of asylum on the merits, he necessarily fails to establish eligibility for withholding of

removal or protection under CAT.").[3]

## III. CONCLUSION

For the foregoing reasons, we conclude that the BIA's and IJ's denial of asylum, withholding of removal, and CAT relief are supported by substantial evidence. Accordingly, we deny Azcarate's petition for review.

**PETITION DENIED.**

---

[3]Azcarate's claim that the IJ abused his discretion by failing to conduct an independent evaluation of his CAT claim is belied by our precedent and does not require additional discussion. See Forgue, 401 F.3d at 1288 n.4.