[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 07-12428
Non-Argument Calendar

_____

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
April 29, 2008
THOMAS K. KAHN
CLERK

Agency Nos. A97-923-540
A97-923-541

RANDHY ANASOFIA UGAZ,
PIER CUTILLI,

Petitioners,

versus

U.S. ATTORNEY GENERAL,

Respondent.

_____

Petition for Review of a Decision of the
Board of Immigration Appeals

_____

**(April 29, 2008)**

Before ANDERSON, HULL and KRAVITCH, Circuit Judges.

PER CURIAM:

Randhy Anasofia Ugaz, a native and citizen of Peru, petitions this court for

review of the Board of Immigration Appeals' ("BIA") affirmance of the Immigration Judge's ("IJ") denial of asylum, 8 U.S.C. § 1158.[1] After a thorough review of the record, we grant the petition and vacate and remand for further proceedings.

I. Background

Ugaz was admitted into the United States on July 1, 2003, as a nonimmigrant visitor for business, with authorization to remain until August 1, 2003.[2] She remained beyond this expiration period and the Department of Homeland Services served Ugaz with a Notice to Appear and a Notice of Referral, charging her as removable under INA § 237(a)(1)(B), 8 U.S.C. § 1227(a)(1)(B). Ugaz applied for asylum, alleging that her work as a professional television journalist and her affiliation with the political party, Alianza Popular Revolucionaria Americana ("APRA"), resulted in persecution.

According to the asylum application and Ugaz's testimony at the removal hearing, Ugaz hired an individual named Cesar Aquino to help with a journalism investigation into tubal ligation program. Aquino allegedly worked with the

---

[1] Ugaz also requested withholding of removal and relief under the United Nations Convention Against Torture. She does not seek review of the denial of this relief; therefore she has abandoned these claims. Sepulveda v. U.S. Att'y Gen., 401 F.3d 1226, 1228 (11th Cir. 2005). We do not discuss these claims further.

[2] Her husband, Pier Cutilli, was admitted on May 2, 2002, under the Visa Waiver Pilot program, with permission to remain until August 1, 2002. He proceeded as a derivative applicant on Ugaz's asylum application.

Catholic Church and Priest Lancier, and was involved with social programs within Peru's correctional facilities. Aquino put Ugaz in touch with women for her story. Ugaz and Cutilli attended meetings with these women, with Cutilli acting as her assistant in the investigation. Through Aquino, Ugaz met many people who had participated in the communist movements of the SL, and Tupac Amaru. Due to her democratic beliefs, she attempted to discourage these individuals from their affiliation with the guerilla groups.

Ugaz later discovered that Aquino had connections with the SL. Ugaz began receiving threatening phone calls from individuals who identified themselves as members of the SL, who told her to stop talking about them. The callers told Ugaz that her perception of them had to change, or she and her husband would be judged by them.

Ugaz changed her cell phone number and went to the police regarding the calls, but both she and the police initially believed that the callers had "made a mistake and that is why I changed my cell phone." However, she continued to receive calls after changing her number. In December 2001, Ugaz received a call instructing her, "female dog, shut your mouth." In March 2002, Ugaz received a call in which she was told that they were going to "close [her] beak." Ugaz received threatening phone calls both at her house and on her cell phone, particularly at night. Ugaz informed her employer that she felt her life was at risk.

3

On March 25, 2002, at approximately 10 p.m., as Ugaz and Cutilli were driving home from her work, they were stopped by three masked individuals, who pulled them out of their car and began hitting Cutilli. Ugaz tried to defend Cutilli, but was "hit so bad [she] couldn't move." The attackers warned them that "this was only the beginning of a punishment for interfering in what wasn't [her] business." After the attackers left, bystanders immediately took Ugaz and Cutilli to the hospital. Ugaz and Cutilli filed a police report regarding the attack. She and Cutilli then made the decision to travel to the United States, "in search of peace."

Ugaz and Cutilli remained in the United States for one year before Ugaz returned to Peru in May of 200[3]. During Ugaz's absence, Ugaz's mother continued to receive phone calls inquiring into Ugaz's whereabouts. Ugaz explained that while in the United States, her hope was that "everything should pass by, finish, and it would be forgotten and it would be okay to go back." She returned to Peru "thinking that everything had ended," but that as soon as the guerillas found out she was back, the threatening calls resumed. On June 10, 2003, she received a call during which she was told, "die like dogs all the enemies of the revolution." She called Cutilli, who had remained in the U.S., and told him not to return to Peru. On the evening of June 20, 2003, a rock wrapped in the SL's flag

4

and containing a message threatening her with death, was thrown through her window. Fearful, Ugaz returned to the United States and requested asylum.

In support of her application Ugaz submitted the following records. The 2004 U.S. Department of State's Country Reports on Human Rights Practices, indicating that the SL was responsible for killings and other abuses; the SL continued to kill civilians as well as military and police officials, with 120 terrorist incidents from January to December, the vast majority of which occurred in rural areas that historically suffered from SL violence. The report further stated that the SL continued to be a leading violator of the rights of indigenous people, coercing indigenous peasants into joining its ranks and demanding war taxes, and that journalists and media outlets were intimidated during the year, with 2 reporters killed, and 121 reported cases of harassment, including verbal or physical violence and threats. Furthermore, one reporter received death threats after disseminating an interview with the SL leaders.

The record also contained copies of the hospital's medical records from the night of the March 25 attack. The records indicate that Ugaz suffered injuries from "[p]hysical aggression by unknown persons." Her injuries included broken front teeth, and deep bruising and ruptured blood vessels in her right arm and right leg, produced by a hard, blunt object. Cutilli's injuries included two broken ribs and bruising at the anterior thorax and the lower 1/3 of the rib cage. The report also

5

stated that Cutilli suffered deep bruising and broken blood vessels in his face, forearms, right wrist and both legs, produced by a hard, blunt object.

Ugaz also submitted the certified copy of the police report, dated March 26, 2002:

> That on March 25, 2002, aprox[imate] time 22:00, when she was returning from chan[n]el 4 wh[ere] she worked. . . . in the company of her boyfriend. . . . [she was] intercepted [o]n the corner. . . . 3 [men] got o[ut of] the car. . . . striking the known ones in different parts of the body, causing 2 fractured ribs and multiple trauma, trying to defend the claimant so they would stop the beating, she was also hurt it seems by the butt of a gun provoking the breakage of two superior front teeth. Before leaving quickly into their car, they warned. . . . that this was only the beginning of a punishment for an interference into something that was none of [her] business, mentioning that they were terrorist elements of the SL. . . .

Another police report, dated June 20, 2003, described "[a]ttempted terrorism," and Ugaz's report that "a rock was thrown and a subversive propaganda from [t]he [r]evolutionary party called Sendero Luminoso. . . was around the rock, breaking her principal front window." She also reported receiving a death threat ten days earlier by telephone, during which the caller said "the enemies of the revolution die like dogs."

Ugaz's mother received two more calls after Ugaz returned to the United States in June 2003; one inquiring into Ugaz's whereabouts, and another in which the caller said nothing and hung up. Ugaz has remained in the United States since June 30, 2003. She explained that she had not relocated to another part of Peru

6

because the terrorists were all over the country, though mostly in rural sites. She stated that she could not return to Peru because she is a threat to her family, because "[t]errorism continue[d] when I was there," and "[s]ubversive propaganda was all over the place."

The IJ denied Ugaz's application for asylum, finding that Ugaz's testimony did not meet the burden of establishing eligibility, and that it was not detailed enough to suggest that there was a concerted effort by the SL to inflict harm on Ugaz and Cutilli. The IJ found Ugaz's testimony was somewhat implausible, and that the events did not constitute past persecution.

Ugaz appealed to the BIA, which dismissed the appeal, finding that Ugaz failed to demonstrate either past persecution or a well-founded fear of future persecution on a protected ground, as the calls and the beating did not rise to the level of past persecution. Although the BIA determined that the IJ's adverse credibility finding was clearly erroneous, the BIA also concluded that Ugaz failed to establish a nexus between the phone calls, the beating, and a protected ground. The BIA further found that Ugaz's voluntary return to Peru in April 2003 undermined the reasonableness of her claim, as did her failure to apply for asylum during her initial one-year stay in the United States. Ugaz now petitions this court for review.

II. Analysis

Because the BIA did not expressly adopt the IJ's decision, we review only the BIA's decision. Ruiz v. Gonzales, 479 F.3d 762, 765 (11th Cir. 2007) (internal citations omitted).

"A factual determination by the BIA that an alien is statutorily ineligible for asylum or withholding is reviewed under the substantial evidence test." Al Najjar v. Ashcroft, 257 F.3d 1262, 1283 (11th Cir. 2001) (internal quotations and citations omitted). We must affirm the BIA's decision "if it is supported by reasonable, substantial, and probative evidence on the record considered as a whole." Id. at 1284 (internal quotations omitted). Under this test, "we view the record evidence in the light most favorable to the agency's decision and draw all reasonable inferences in favor of that decision." Adefemi v. Ashcroft, 386 F.3d 1022, 1027 (11th Cir. 2004) (en banc). Accordingly, "to conclude the BIA's decision should be reversed, [this court] must find that the record not only supports the conclusion, but compels it." Ruiz 479 F.3d at 765 (internal quotations omitted).

The Attorney General or Secretary of Homeland Security has discretion to grant asylum if the alien meets the definition of "refugee," as defined by 8 U.S.C. § 1101(a)(42)(A). 8 U.S.C. § 1158(b)(1)(A). A refugee is defined as:

> any person who is outside any country of such person's nationality, or, in the case of a person having no nationality, is outside any country in which such person last habitually resided, and who is unable or unwilling to return to, and is unable or unwilling to avail

8

himself or herself of the protection of, that country because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion.

8 U.S.C. § 1101(a)(42)(A). The asylum applicant carries the burden of proving statutory ''refugee'' status, and thereby establishing asylum eligibility. Al Najjar, 257 F.3d at 1284. When the agency does not make an explicit adverse credibility determination, we consider the petitioner's testimony to be credible. Mejia v. U.S. Atty. Gen., 498 F.3d 1253, 1257 (11th Cir. 2007).

"To establish asylum [eligibility] based on past persecution, the applicant must prove (1) that she was persecuted, and (2) that the persecution was on account of a protected ground." Santamaria v. U.S. Att'y Gen., 2008 WL 1787731, at *5 (11th Cir. Apr. 22, 2008); Silva v. U.S. Atty. Gen., 448 F.3d 1229, 1236 (11th Cir.2006). To establish eligibility for asylum based on a well-founded fear of future persecution, the applicant must prove "(1) a subjectively genuine and objectively reasonable fear of persecution that is (2) on account of a protected ground." Id. at *5 (internal and quotation marks omitted). A showing of past persecution creates a rebuttable presumption of a well-founded fear of future persecution. Sepulveda v. U.S. Atty. Gen., 401 F.3d 1226, 1231 (11th Cir. 2005).

Although neither the INA nor the regulations define "persecution," this court has stated that "persecution is an extreme concept, requiring more than a few isolated incidents of verbal harassment or intimidation, and that mere harassment

9

does not amount to persecution." Sanchez Jiminez v. U.S. Att'y Gen., 492 F.3d 1223, 1232 (11th Cir. 2007) (quoting Sepulveda, 401 F.3d at 1231). The record must be considered cumulatively, and escalating physical assaults and verbal harassment may qualify as persecution. See Mejia, 498 F.3d at 1257-58; Delgado v. U.S. Atty. Gen., 487 F.3d 855, 861-62 (11th Cir. 2007).

Notably, the BIA disagreed with the IJ's finding that Ugaz's testimony was implausible. In addition, the BIA rejected the IJ's determination that Ugaz had not shown that it would be impossible to relocate within Peru. Thus, the only issue before us is whether substantial evidence supports the BIA's findings that Ugaz failed to establish past persecution or a well-founded fear of future persecution on account of a protected ground.

Upon review, we conclude that the record compels the conclusion that Ugaz suffered past persecution on account of a protected ground. Assuming, as we must in the absence of an explicit adverse credibility finding, that Ugaz's testimony was credible, the evidence demonstrates that Ugaz received numerous threatening telephone calls over an initial 18-month period, and she suffered a violent physical attack resulting in bodily injuries. After Ugaz left Peru, her mother continued to receive threatening calls. And upon Ugaz's return to Peru, the calls continued and a rock, wrapped in the SL flag, was thrown through her living room window.

Although this court stated in Silva that the receipt of anonymous threats

10

[over a two month period], without more, does not qualify as persecution," Silva is distinguishable because, in this case, there was testimony that the calls referenced the petitioner's political activity. Cf. Silva, 448 F.3d at 1237. Furthermore, the petitioner in Silva experienced threatening phone calls for only two months, whereas Ugaz received them over a period of approximately 18 months prior to her initial departure for the United States, in May 2002. Silva, 448 F.3d at 1237. And the calls resumed when Ugaz return to Peru.

Moreover, the certified police report regarding the attack of March 25, 2002, states that the attackers told Ugaz they were members of SL, the callers repeatedly referenced her political vocalizations, and Ugaz testified as to the identity of her attackers. Physical violence, coupled with verbal threats can qualify as persecution. See Mejia, 498 F.3d at 1257-58; see also Delgado, 487 F.3d 855 (11th Cir. 2007) (granting relief where the petitioners were stopped by masked men who pointed unloaded weapons at them and pulled the triggers, one of the petitioners was later attacked and beaten, and in both incidents, the attackers gave warnings as to the consequences that would flow from the petitioners' political opinions).

We find additional support for our conclusion in this court's recent opinion in Santamaria, 2008 WL 1787731, at *7-8. In that case, this court concluded that the petitioner suffered past persecution on account of a protected ground where,

11

over a two-year period, FARC members (1) yanked her out of a car by her hair and threatened her with death based on her political activities; (2) painted threatening graffiti on her property explicitly referencing her political organization; (3) tortured and killed a family groundskeeper as a penalty for not revealing her whereabouts; and (4) beat, kidnaped, and threatened Santamaria with death before she managed to escape. In reaching this conclusion, this court explained that serious physical injury is not required to prove past persecution where the petitioner demonstrates repeated threats combined with other forms of severe mistreatment. Id.

Here, the evidence compels a finding that Ugaz did in fact experience past persecution on account of her political opinion. This entitles her to a rebuttable presumption that she has a well-founded fear of future persecution. On remand, the government bears the burden of rebutting this presumption.[3] Accordingly, we grant the petition and vacate and remand for further proceedings consistent with this opinion.

**VACATED and REMANDED.**

---

[3] We note that the IJ made factual findings regarding Ugaz's ability to relocate within Peru, or to seek citizenship in Italy, where her husband is a citizen. The BIA, however, made no such findings. As our review is limited to the BIA's decision, we conclude the proper avenue is to remand for the government to address its burden.