[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
JULY 23, 2009
THOMAS K. KAHN
CLERK

No. 09-10092
Non-Argument Calendar
_____

Agency No. A097-975-701

ENKELA RAKIQ,

                                                          Petitioner,

versus

U.S. ATTORNEY GENERAL,

                                                          Respondent.

_____

Petition for Review of a Decision of the
Board of Immigration Appeals
_____

(July 23, 2009)

Before BIRCH, HULL and PRYOR, Circuit Judges.

PER CURIAM:

Enkela Rakiq, a native and citizen of Albania, petitions for review of the decision of the Board of Immigration Appeals that denied her application for asylum and withholding of removal under the Immigration and Nationality Act and the United Nations Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment. 8 U.S.C. §§ 1158, 1231; 8 C.F.R. § 208.16(c). The Board and the immigration judge found that Rakiq was not credible and concluded that Rakiq failed to establish past persecution, a well-founded fear of future persecution, or a likelihood of torture if she returns to Albania. We deny the petition.

## I. BACKGROUND

Rakiq was admitted to the United States in June 2003 as a visitor with permission to remain in the country until December 2003. In June 2004, the Immigration and Naturalization Service served Rakiq with a notice to appear. Six months later, Rakiq filed an application for asylum, withholding of removal, and relief under the Convention.

In her application, Rakiq alleged persecution based on her political opinion and membership in a particular social group, and provided a history of her persecution in Albania. In 2000, Rakiq was hired by the Ministry to Education to teach in Pistull, Albania. When Rakiq inquired why Pistull lacked a school building, local residents told Rakiq that the government refused to provide funding

2

because the village was too "Democratic." Rakiq asked to convert abandoned housing to a school building, but representatives of the Ministry of Education told her to "mind [her] own business." After Rakiq ignored their warnings and began repairs to the housing, the Ministry refused to extend her contact to teach, but Rakiq obtained a position to teach in a private kindergarten.

Rakiq alleged that both she and members of her family were persecuted for their political activities. Rakiq alleged that, during parliamentary elections in 2001, she campaigned for the Democratic Party, but stopped participating after her cousin, Sara Hublina, was "abducted and hurt" in retaliation for her mother's political activities. Later, Rakiq's father was threatened that he and Rakiq would be harmed for his work with the Democratic Party. In April 2002, Rakiq "began to get this threat [herself] at home by phone" in which an anonymous caller said that Rakiq would be "good merchandise," which Rakiq interpreted to mean she would be kidnapped and subject to human trafficking. Rakiq prepared to leave the country, but her father and brother continued to campaign for the Democratic Party. In March 2003, a man led Rakiq into an alley, placed a gun at her head, and said she was "marked and that [her] dad and brother should know better." The man hit, kicked, and fondled Raqik, then left her in the alley. Raqik went into hiding until she left Albania.

Rakiq attached several documents to her application. Rakiq submitted a

certificate from the Democratic Party that stated she was a member and "well known activist [in] the areas where she worked." Rakiq also submitted an affidavit from the principal of the Pistull High School, which stated that Rakiq had requested a new school building, her requests were not well-received, and the Ministry of Education gave no reason to explain why it had refused to reappoint Rakiq as a teacher. The record also included reports about the conditions in Albania and documents about a grant of asylum to the Hublina family. The Albania Profile prepared by the State Department and the 2004 Country Report both stated that the Albanian government generally respected the rights of individuals in opposition parties. Both reports also stated that women were prey to human trafficking and some government authorities were complicit in the crimes.

At the evidentiary hearing, Rakiq blamed her persecution on her political activities and provided more detail about that persecution. Rakiq testified that she left Albania because a member of the Socialist Party forced her into a corner, where he kicked and fondled her. The man said that Rakiq was very involved with the Democratic Party and the school in Pistull, and that "[t]his was none of [her] business." When the immigration judge inquired to verify that Rakiq had been fired from her position in Pistull three years before the attack, Rakiq explained that she "took an interest in [the school] many times after that." The immigration judge responded that Rakiq's counsel needed to "discuss this with" Rakiq. The judge

4

stated that Rakiq's testimony was "not too believable" and it seemed "extremely illogical" that a stranger would confront Rakiq three years after she had "just made some inquiries about opening up a closed school building . . . in a town that's . . . an hour drive away[.]"  Rakiq later added that her assailant also told her to end her "meetings and gatherings with the party[,] [] warned [her] to stop taking an interest in teaching" and told her she was "involved a little bit too much and [she] had to stop or something worse would happen."

Rakiq also testified that she received about 100 telephone calls that mentioned the school in Pistull and threatened that if Rakiq did not end her participation in the Democratic Party, she would be kidnapped like her cousin. Rakiq stated that she believed it would be pointless to report the telephone calls to the authorities.  Rakiq testified that she "[did not] know who" called her "but [she] believe[d] [they were] affiliated with the socialist party."  Rakiq explained that she could not relocate to the capital of Albania because many members of the socialist party lived there, but she acknowledged that her father and brother had not relocated in Albania.

The immigration judge denied Rakiq's application.  The judge found that Rakiq was "not a particularly credible witness" and mentioned several inconsistencies in her application and testimony about the number of threatening phone calls Rakiq had received; the date she was assaulted; and the reasons given

5

by her assailant for the attack in the alley. The judge doubted that the assailant blamed his assault on Rakiq's attempts to build a school three years earlier. The immigration judge found that Rakiq failed to submit any corroborating evidence from any family member to "fill in the blanks" of her story, which was "highly unspecific" and contained "obvious" discrepancies. The judge ruled that Rakiq "completely and in every way failed to sustain her burden of proof with regard to her applications for relief."

The Board remanded the case to the immigration judge. The Board was not convinced that Rakiq's "claim to asylum [was] adequately presented." The Board instructed the immigration judge to make a "new credibility determination" and to consider any additional evidence offered by Rakiq in support of her application.

On remand, the government submitted the 2006 Country Report and Rakiq testified a second time. The Country Report stated that the Albanian government respected human rights and, although women were trafficked, there were no reports that police were involved in those crimes.

Rakiq's testimony was consistent with her earlier testimony except she blamed her attack on political activities by both her and her father. Rakiq testified that her assailant mentioned both her and her father's political activities; advised her that "the people in power are not very fond of what you are doing" and would "take care of it"; and warned her that if she did not end her political activities, he

6

would "kidnap [her] and take [her] outside [Albania] into the prostitution." Rakiq attributed any inconsistencies in her present testimony and her earlier testimony to nervousness. Rakiq stated that she was scared to return to Albania, even though the Democratic Party had taken control of the government, because members of the Socialist Party retained control of local governments and she would be located easily in the small country. Rakiq acknowledged that her father and brother had remained in their homes unharmed.

The immigration judge denied Rakiq's application a second time. The immigration judge again found Rakiq not credible and stated that Rakiq's "story changed, yet again." The judge mentioned inconsistencies in Rakiq's application and testimonies about the statements made by her assailant about future persecution and the reasons for his attack and about the number of telephone calls Rakiq had received. The judge found "surprising" that Rakiq had been in contact with her father since her first evidentiary hearing but did not obtain an affidavit from her father about the telephone calls. The judge ruled that, even if he were to find Rakiq credible, she failed to meet her burden to provide "specific, detailed, and consistent applications and facts" to prove she was eligible for asylum, or to satisfy the even "higher burden of proof" required for withholding of removal or relief under the Convention.

The Board dismissed Rakiq's appeal. The Board agreed with the

7

immigration judge that Rakiq's "changing version of events seriously undermine[d] her credibility" and mentioned the inconsistencies in Rakiq's application and testimonies about the threats made by her assailant and the reasons given for the attack. The Board also agreed with the immigration judge that Rakiq failed to "sustain her burden of proving that she is a refugee" because Rakiq failed to "offer credible, corroborating evidence verifying the events that she recounted in her testimony" and because her father and brother had remained in Albania unharmed. The Board concluded that Rakiq also could not satisfy the "more stringent burden applicable to withholding of removal" and failed to establish that she would be tortured if she was returned to Albania.

## II. STANDARD OF REVIEW

We review the decision of the Board to determine whether it is "supported by reasonable, substantial, and probative evidence on the record considered as a whole." Al Najjar v. Ashcroft, 257 F.3d 1262, 1284 (11th Cir. 2001). "To reverse [those] fact findings, we must find that the record not only supports reversal, but compels it." Mendoza v. U.S. Att'y Gen., 327 F.3d 1283, 1287 (11th Cir. 2003). We review the legal conclusions of the Board de novo. Id. at 1287 n.6. When the Board adopts the findings of the Immigration Judge, we review the decision of the Immigration Judge. Al Najjar, 257 F.3d at 1284.

## III. DISCUSSION

Rakiq challenges the decision to deny her applications for asylum, withholding of removal, and relief under the Convention. Rakiq argues that substantial evidence does not support the finding that she was not credible. Rakiq also argues that she presented consistent and sufficiently detailed testimony to establish she suffered past persecution, has a well-founded fear of future persecution, and was tortured. Rakiq's arguments fail.

Substantial evidence supports the finding that Rakiq was not credible, see Al Najjar, 257 F.3d at 1283–84, and the immigration judge and Board provided specific and cogent reasons to support that finding. Chen v. U.S. Att'y Gen., 463 F.3d 1228, 1231 (11th Cir. 2006). Rakiq provided inconsistent accounts about the threats made by her assailant and the reasons given for his attack. Rakiq stated in her application that the threats began with a statement by the assailant that she was "marked," but she testified first that the assailant threatened "something worse," and later on remand that he threatened to abduct Rakiq and force her into prostitution. Rakiq also changed the reasons given by her assailant for his attack: she alleged in her application that the attack was motivated by the political activities of her brother and father; she testified at her removal hearing that she was attacked for only her activities; and on remand she testified that the attack was in response to activities of her and her father.

9

Rakiq also failed to prove that she suffered past persecution or has a well-founded fear of future persecution. Rakiq's testimony about the telephone calls and her single attack by an unidentified man supports the finding that Rakiq suffered harassment, not persecution. See Silva v. U.S. Att'y Gen., 448 F.3d 1229, 1238 (11th Cir. 2006); Sepulveda v. U.S. Att'y Gen., 401 F.3d 1226, 1231 (11th Cir. 2005). Rakiq's provided inconsistent accounts about these incidents and failed to submit any evidence to corroborate her stories. See Mendoza, 327 F.3d at 1287. Rakiq also testified that she is associated with the current governing party and her family has remained in Albania unharmed without relocating.

Substantial evidence also supports the finding that Rakiq will not likely be tortured upon her return to Albania. "The burden of proof for an applicant seeking withholding of removal under the Convention, like that for an applicant seeking withholding of removal under the statute, is higher than the burden imposed on an asylum applicant." Al Najjar, 257 F.3d at 1303; see 8 C.F.R. § 208.16(c)(2). Because Rakiq failed to establish a well-founded fear of persecution, she also cannot establish that she would suffer "torture." See Al Najjar, 257 F.3d at 1303–04.

### IV. CONCLUSION

Rakiq's petition for review is **DENIED**.

10